THE JUDGE ROTENBERG EDUCATIONAL CENTER, INC., &
others[1] *vs.* COMMISSIONER OF THE DEPARTMENT OF
MENTAL RETARDATION (No. 1).[2]

Bristol. November 5, 1996. - March 13, 1997.

Present: ABRAMS, LYNCH, GREANEY, FRIED, & MARSHALL, JJ.

*Department of Mental Retardation. Mental Health. Contempt. Executive.
Constitutional Law,* Separation of powers. *Contract,* Settlement agree-
ment. *Practice, Civil,* Contempt, Findings by judge, Discovery, At-
torney's fees, Costs. *Evidence,* Curative admissibility, Relevancy and
materiality. *Receiver. Probate Court,* Findings by judge, Jurisdiction.

The clear terms of a court-approved settlement agreement that was
    incorporated in an order of the court, providing that a probate judge
    was to make ultimate decisions regarding individual substituted-
    judgment treatment plans of patients in a mental health facility, reserv-
    ing regulatory authority over the care provider's program and facilities
    to the predecessor of the Department of Mental Retardation, were not
    too ambiguous to support a finding of contempt [442-451], and ample
    evidence at a contempt proceeding supported a probate judge's findings
    and warranted her conclusion that the department had violated the
    settlement agreement by unilaterally interfering with individual treat-
    ment plans and through bad faith regulatory practices designed to
    interfere with the operations and funding of that mental health care
    provider [451-459].
In a contempt proceeding involving the Department of Mental Retarda-
    tion, the judge did not impermissibly shift the burden to the department
    to prove that its commissioner had acted in good faith. [459-460]
Contempt sanctions were appropriately imposed on the Department of
    Mental Retardation for its predecessor's bad faith actions in contraven-
    tion of a settlement agreement incorporated as an order of the court.
    [460-461]

---

[1]Matthew L. Israel, executive director of The Judge Rotenberg
Educational Center, Inc. (JRC); Leo Soucy, individually and as parent and
next friend of Brendon Soucy; and Peter Biscardi, individually and as par-
ent and next friend of P.J. Biscardi, both as representatives of the class of
all patients at the Behavior Research Institute, Inc., their parents, and
guardians. At the time of the settlement agreement, JRC was known as the
Behavior Research Institute, Inc. We shall refer to the plaintiff as JRC.

[2]The director of the office for children, the predecessor in interest of the
Department of Mental Retardation (department), was originally named as
the defendant in this case.

In a contempt action, the judge did not abuse her discretion in denying a motion to extend discovery beyond a certain date [461-462], and the judge did not err in excluding evidence proffered under the curative admissibility doctrine, where there was no showing that the evidence sought to be rebutted, even if it were inadmissible, created significant prejudice to the proffering party [462-463].

A judge of the Probate Court properly exercised equity jurisdiction to appoint a receiver to administer, manage, and operate the ordinary affairs of the Department of Mental Retardation in all of its relationships with a certain mental health care facility, where the judge's findings warranted the conclusion that the department was unwilling to comply with a court-ordered settlement agreement regarding that facility [463-465]; further, to the extent that the receiver's powers were narrowly tailored to enforcement of the agreement and restoring legality, the judge did not exceed her authority or violate the separation of powers expressed in art. 30 of the Massachusetts Declaration of Rights [465-467]; however, provisions of the order that gave the receiver authority over discretionary functions of the department were overly broad and were ordered struck [467].

In an action for contempt brought against the Department of Mental Retardation for its actions in contravention of a court-ordered settlement agreement with a mental health care facility, there was no statutory provision for the recovery by the prevailing party of attorney's fees or postjudgment costs from the Commonwealth. [467-470]

CIVIL ACTION commenced in the Bristol Division of the Probate and Family Court Department on February 28, 1986.

A complaint for contempt, filed on September 3, 1993, was heard by *Elizabeth O'Neill LaStaiti, J.*

The Supreme Judicial Court granted an application for direct appellate review.

*Judith S. Yogman*, Assistant Attorney General (*Lucy A. Wall*, Assistant Attorney General, with her) for the Commissioner of the Department of Mental Retardation.

*Roderick MacLeish, Jr.* (*Peter F. Carr, II*, with him) for the Judge Rotenberg Educational Center, Inc.

*Eugene R. Curry* for the class of patients, parents & guardians.

*C. Michele Dorsey* (*Paul A. Cataldo* with her) for the class of patients.

The following submitted briefs for amici curiae:

*Cathy E. Costanzo, John Coyne, Richard Ames & Robert D. Fleischner*, for the guardianship counsel.

*Timothy A. Sindelar & Allen M. Karon* for National Association of Protection and Advocacy Systems & others.

*Janet Cohan*, for Advocacy Network, Inc., & another.

*Ralph T. Calderaro*, Special Assistant Attorney General, for Disabled Persons Protection Commission.

LYNCH, J. The commissioner of the Department of Mental Retardation (department) appeals from a final judgment of the Bristol County Probate and Family Court finding the department in contempt of a court-ordered settlement agreement entered into by the Judge Rotenberg Educational Center, Inc. (JRC), the patients at JRC, their parents and guardians, and the office for children (OFC).[3] After trial, the judge concluded that the department had violated the settlement agreement; enjoined the department from failing to comply with the terms of the agreement; appointed a receiver to administer, manage, and operate the department in all of its relationships with JRC; and awarded attorney's fees to JRC, counsel for the parents, and counsel for the class of patients.[4] We granted the department's application for direct appellate review.

---

[3]The settlement agreement dated December 12, 1986, provided in part: "On or before July 1, 1987, the licensing responsibility for [JRC] shall be transferred from [OFC] to [the Department of Mental Health] in accordance with an interagency agreement . . . ." On July 1, 1987, however, the department assumed the legal responsibility for licensing JRC, St. 1986, c. 599, and on October 24, 1988, moved that the settlement agreement be modified to clarify that "it has also assumed [the Department of Mental Health's] obligations under the Settlement Agreement." The judge treated the department's motion as a motion to intervene under Mass. R. Civ. P. 24 (b) (2), 365 Mass. 769 (1974), and "welcome[d] it as a party under the settlement agreement."

[4]Prior to trial, the contempt complaint was amended several times. After the judge allowed JRC's motion to file a third amended complaint, she issued a preliminary injunction. The department appealed from this injunction to a full panel of the Appeals Court pursuant to G. L. c. 231, § 118, second par. This court thereafter granted direct appellate review, and that appeal is the subject of another case, also decided today. *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 2), post* 471 (1997). In addition, the department petitioned a single justice of the Appeals Court pursuant to G. L. c. 231, § 118, first par., for interlocutory relief from or modification of the preliminary injunction pending appeal. The single justice modified the injunction and later, in response to. a request for clarification, enjoined JRC from using certain challenged "Level III" aversive treatments. The single justice also heard an appeal from the Probate Court judge's order pursuant to a "global motion" filed by guardianship counsel on behalf of fifty-two JRC patients in each of their individual guardianship cases requesting the Probate Court judge to issue orders requiring JRC to cease using certain Level III aversive procedures. The

This contempt action has its origin in a lawsuit brought in 1986 by JRC, the class of all patients at JRC, their parents and guardians, against OFC alleging that OFC had engaged in bad faith regulatory and licensing activities and violated the civil rights of the patients. On June 4, 1986, the judge entered a preliminary injunction enjoining OFC from enforcing its orders and concluded in extensive findings that the director of OFC had engaged in bad faith regulation of JRC, and that her termination of JRC's treatment procedures was without medical support, leaving the program an "empty shell for those [patients] who require aversives as part of their treatment." The judge further found that the director of OFC attempted to hide the lack of clinical support for her decision by altering her own agency's laudatory report of JRC, and by sending an evaluation team, biased against the use of aversive therapy, to conduct an "objective" evaluation of the JRC program. The judge therefore found that the director's orders constituted arbitrary treatment decisions that "play[ed] 'Russian Roulette' with the lives and safety of the [patients] at [JRC]."

The preliminary injunction was upheld by a single justice of the Appeals Court, who ruled that there was ample evidence to support both the judge's entry of injunctive relief and her conclusion that the director of OFC acted in "bad faith in [her] handling of the status of [JRC's] license and its treatment programs." Subsequently, the plaintiff class, JRC, and OFC entered into the settlement agreement which forms the basis of this appeal.[5] The judge approved the settlement agreement on January 7, 1987, and incorporated it as an or-

single justice of the Appeals Court allowed the patients' petition and incorporated by reference the previous order that had been entered and clarified, as the orders dealt with the same aversive treatments. A single justice of this court denied JRC's request for relief from the order of the single justice of the Appeals Court. JRC then appealed to the full panel of the Appeals Court, and we granted the department's application for direct appellate review. That appeal is also the subject of another case decided today. *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 3), post* 473 (1997).

[5]Part A of the settlement agreement provides that "[a]versive procedures are permitted for use at [JRC] only when authorized as part of a court-ordered 'substituted judgment' treatment plan for an individual client, when such cl nt is either a minor or is not able to provide informed consent thereto."

Part B of the settlement agreement provides: "On each occasion when

der of the court.[6] In 1993, JRC brought this contempt action, alleging that the department had repeatedly violated the settlement agreement.

The following facts are derived from the judge's findings, which she made after a thirteen-day trial.[7]

In 1991, JRC applied to be recertified in the use of "Level III" aversive behavior modification techniques.[8] The depart-

the Court issues a substituted judgment treatment plan, the Court shall also appoint a monitor who will report to the Court as to the effectiveness of the treatment plan, adherence to order by [JRC], and any proposed modifications to the treatment plan." Part B also provides that the judge would appoint a suitable person "who shall undertake general monitoring of [JRC]'s treatment and educational program." The court monitor was also to be responsible for "overseeing [JRC]'s compliance with all applicable state regulations, except to the extent that those regulations involve treatment procedures authorized by the Court in accordance with [part] A." Finally, part B provides that the court monitor "shall arbitrate any disputes between the parties, and in the event that any party disagrees with any decision or recommendation of the [court monitor], the matter shall be submitted to the Court for resolution."

Part C of the settlement agreement provides in part that "intake at [JRC] for new clients shall be reopened and shall not be impermissibly obstructed during the pendency of this agreement."

Finally, part L of the settlement agreement provides that "each party shall discharge its obligations under the terms of this agreement, in good faith."

[6]Originally the settlement agreement provided that a review would occur every six months with the settlement agreement automatically terminating at the second review unless the judge ordered otherwise. After the second six-month review, the judge extended the agreement until further order of the court.

[7]The judge made 304 findings of fact, but the last two were numbered 303. The department disputes all of the 304 findings of fact. We therefore review those facts that are necessary to support a finding of contempt and the imposition of certain remedies.

[8]At the time of the trial the applicable regulations were codified in 104 Code Mass. Regs. § 20.15. The regulations, as of September, 1995, appear at 115 Code Mass. Regs. § 5.14.

Level III aversive therapies are defined by the department regulations as "[a]ny Intervention which involves the contingent application of physical contact aversive stimuli such as spanking, slapping, or hitting;" "Time Out wherein an individual is placed in a room alone for a period of time exceeding 15 minutes;" "[a]ny Intervention not listed . . . as a Level I or Level II Intervention which is highly intrusive and/or highly restrictive of freedom of movement;" or "[a]ny Intervention which alone, in combination with

ment assigned a team to evaluate the application and to make a site visit to JRC. The team visited JRC on December 9 and 10, 1991, reviewed voluminous materials, and met with a number of employees at JRC. An assistant general counsel of the department who was a member of the team prepared a report dated December 21, 1991. The report recommended that JRC be recertified to employ aversive procedures, subject to five conditions which were characterized as "minor." The report included compliments about JRC which "concluded that the programs at JRC were in conformity with [the department] regulations and the directives of the Bristol County Probate Court."

Almost six months after the report was submitted, the department's director of quality assurance notified the executive director of JRC that the department had "accepted the recommendations of the team." The department, however, did not grant certification to JRC at this time even though that was the recommendation of the review team.

One month after JRC received the letter stating that the recommendations of the review team had been accepted, the department's director of quality assurance sent another letter

---

other Interventions, or as a result of multiple applications of the same Intervention poses a significant risk of physical or psychological harm to the individual." 115 Code Mass. Regs. § 5.14 (3) (d) (1995).

Under the department's regulations, "No Behavior Modification plans employing Level III Interventions may be implemented except in a program or a distinct part of a program that . . . is . . . specially certified by the Department as having authority to administer such treatment." 115 Code Mass. Regs. § 5.14 (4) (f) (1995).

Before a program can be certified, a comprehensive evaluation is made of a program. As part of the evaluation, a program must provide "a comprehensive statement of the program's policies and procedures for the development and implementation of plans employing Level III Interventions, including a description of the program's actual use, or proposed use, of such procedures, and of the program's policies and practices regarding the training and supervision of all staff involved in the use of such procedures." 115 Code Mass. Regs. § 5.14 (4) (f) (3). The department then reviews the program, and has access to written plans designed for patients that are reviewed to ensure that they comport with applicable regulations, the physical facility, and the professional credentials of the program's employees. In addition, the department also has the opportunity to observe the treatment employed by the program. 115 Code Mass. Regs. § 5.14 (4) (f) (6). In short, a decision to certify a program is an acknowledgment that the program is complying with all applicable regulations. 115 Code Mass. Regs. § 5.14 (4) (f) (7).

to JRC's executive director stating that two new behavioral programs, the "Specialized Food Program"[9] and the "GED Program,"[10] had been brought to her attention and needed to be reviewed as part of the recertification process. A second review team, which also included the department's assistant general counsel, was sent to JRC for a site visit and concluded that JRC had complied with all five prior conditions of certification in the December 21, 1991, report and that there were no adverse health effects from either the "GED-4"[11] or the Specialized Food Program. The judge found that "[i]t was clear that the team found JRC to be in full compliance with the regulations." Indeed, the team reported that "there is no reason to change the previous recommendation that JRC retain its certification to employ Level III interventions in behavior modification programs."

Despite the recommendations of the review teams, the department did not certify JRC. No one in the department spoke to the assistant general counsel about the 1993 report, and, to his knowledge, no one in the department spoke to any members of the team concerning the 1993 report. The commissioner, however, asserted that the 1993 certification team report was not complete because it had not been signed by one member of the review team who had since left the department. The judge also found that neither the 1991 report nor the 1993 report was ever read by the commissioner or the assistant commissioner for quality assurance. Nevertheless, some of the information found in the certification team reports was used in communications to parents, funding agencies, and the court. Despite using this information, however, the commissioner "never revealed the existence of or sent a copy

---

[9]Patients in this program are given a daily caloric requirement based on standardized height and weight charts. They do not receive any food except that earned by passing "behavior contracts" which require that the patient not exhibit some or all of his or her target behavior for a specified period of time. Patients who earn less than their daily caloric requirement are provided "makeup food" in the evening if they receive less than twenty per cent of their caloric requirement during the day. Under the program, a patient could remain on the reduced calorie diet until his or her weight was 87.5% of his or her mid-weight of the desired range.

[10]The GED (graduated electronic decelerator) program is a procedure which involves an electrical stimulus which is utilized when a client engages in maladaptive behavior.

[11]The GED-4 is a stronger version of the GED.

424 Mass. 430 437

Judge Rotenberg Educ. Ctr., Inc. *v.* Commissioner of the Dep't of Mental Retardation (No. 1).

of the 1991 or 1993 certification reports to the Court Monitor, JRC, the funding agencies of JRC, the parents of JRC [patients], or the Court." Rather, the department, led by the commissioner, began a regulatory barrage of JRC that was to last two years.[12]

On August 6, 1993, the department mailed the first of several letters to JRC. While the letter purported to grant "interim certification" to JRC, the judge found that "it was in reality the first volley in a series of actions designed to put JRC out of business." The letter, which followed the favorable report of the 1993 review team by just a few weeks, stated that the department had found "continued and repeated noncompliance [by JRC] with the requirements of [department] regulations."

Following the August 6, letter, JRC requested a meeting with the department and the court monitor pursuant to a provision in the settlement agreement. Between 1987 and at least as late as March, 1993, JRC and the department utilized a court monitor appointed pursuant to the settlement agreement to settle disputes. However, following the August 6, letter, the department declined to meet with JRC if the court monitor was to participate. After JRC's attempt at mediation failed, JRC then responded to the August 6, letter on August 27, 1993, by delivering a written point-by-point refutation of the allegations contained in the letter of August 6, accompanied by three cubic feet of documentation.

On August 31, 1993, the department sent JRC another letter stating that the department had learned from a source "other than JRC" that there were problems with misfirings of the GED. JRC, the commissioner wrote, was "in violation of [the department] regulations" but the department would "give [JRC] further opportunity to provide information." The letter set forth a number of conditions that JRC was required to

---

[12]The judge also found that the commissioner's actions toward JRC were motivated at least in part by his fear that the agency might be portrayed in a negative light by the CBS News television program "Eye-to-Eye." CBS News had contacted the department in the spring of 1993 and requested certain information relative to JRC. The commissioner spoke to the producer of the show and was concerned that the show might depict the department as not doing its job in regulating JRC. While the commissioner testified that he never did anything in anticipation of that program, documents revealed that the commissioner had taken certain actions with the television program in mind.

438 424 Mass. 430

Judge Rotenberg Educ. Ctr., Inc. *v.* Commissioner of the Dep't of Mental Retardation (No. 1).

meet to receive interim certification. One of the conditions, condition 1, restricted the use of certain procedures at JRC. The judge found that this "directly contradicted orders of this Court" and that the commissioner "administratively overruled outstanding orders of this Court" in violation of the settlement agreement.

Another condition of the letter, condition 10, required JRC to notify all funding sources that there must be in place within sixty days an emergency plan to address the funding and logistics of any unexpected medical, personal, or programmatic situations which JRC deemed were beyond its capacity to address. The condition went on to state that the plans "must provide evidence of the funder's ability to immediately provide all needed services for such clients so as to ensure that the client is not substantially endangered." The commissioner testified that this condition was based on prior situations where JRC had unexpectedly discharged patients. The commissioner, however, could only identify one such discharge that had occurred in 1991, and he acknowledged that other providers had unexpectedly terminated patients and that no similar condition had ever been imposed on a provider. The judge found that this condition was purposely designed to obstruct JRC's intake of new patients by alarming funding agencies and was in fact part of a plan to place JRC into receivership or to put JRC out of business.

On September 20, 1993, JRC, the department, and the court monitor reached an agreement whereby JRC would not have to comply with condition 10. Despite this agreement, however, the department mailed copies of the August 6, and August 31, 1993, letters to all of JRC's funding agencies. The letter contained condition 10, despite the agreement modifying condition 10 that had been reached between JRC and the department. Moreover, the judge found that "[i]t was not customary practice to keep funding agencies advised of the certification process. [The] [c]ommissioner could not explain why it was important to send these letters out [and] could not offer an explanation as to why funding agencies were not advised in this mailing that [c]ondition 10 had been modified." The judge concluded that the mailings were made in bad faith with the intent to interfere with JRC's relationships with its funding agencies. In addition, on September 22, 1993, the department filed an unsolicited "Report to the Court"

concerning JRC's "status." Although the document contained numerous reports concerning JRC, including the August 6, and August 31, letters, it did not contain the two favorable certification reports. The judge also found that the report contained "blatant false statements and material omissions" and that the department failed to include the favorable certification recommendation because "they would have contradicted [the department's] report to the court."

On September 24, 1993, the department sent JRC another certification letter addressed to JRC's executive director indicating that certification would be granted conditionally until December 15, 1993. The letter, which was also sent to funding agencies, stated that there were fourteen abuse investigations arising from complaints by former JRC staff and patients. In addition, the letter stated that the allegations were "quite serious on their face, and include claims that [JRC's executive director] personally [was] involved in, or responsible for, abuse against specific [JRC] clients." The commissioner testified, however, that revealing information about abuse charges prior to having them substantiated was a departure from the department's acknowledged practice. In addition, the commissioner conceded that, although the allegations were investigated and not substantiated, the department never sent out a letter so advising the funding agencies.

On December 15, 1993, the commissioner sent JRC yet another letter which stated that "[y]our failure to report a death in 1991 made it impossible for me to fulfil my responsibilities . . . . [JRC] has in the past failed to report deaths and serious injuries as required by law." Again, a copy of this letter was sent to funding agencies. The commissioner admitted in his testimony that his reference to "deaths" was an error and reasoned that it was a typographical error. The judge concluded that the error was intentional, finding that no patient had died at JRC in 1991, and the only death remotely involved was the death of a patient in 1990 which was reported by JRC and that, contrary to the commissioner's testimony, the document did contain sufficient information for an investigation.

In addition to sending out numerous letters to JRC regarding the certification process, from at least September 7, 1993, until the spring of 1994, the commissioner instituted "Tuesday Morning Meetings." These meetings were attended at times

by a "large group" of individuals and at other times by a "small group" of individuals. The commissioner and the assistant commissioner for quality assurance testified that the meetings were held strictly to deal with issues of certification. These meetings did not, in fact, deal strictly with certification. Rather, the judge concluded that a plan was developed at the September 7, 1993, meeting to disrupt the operations of JRC by every conceivable means, including interfering with the financial operations of JRC and disrupting JRC's relationships with funding agencies and parents.

One of the work plans from the Tuesday morning meetings stated that December 15, 1993, was "D-Day" for JRC. The December 15 date coincided with the date JRC's temporary certification was expected to expire and fell just a few days after the department expected to receive a report from an "independent" consulting firm (Rivendell review team), which had been selected by the department to conduct an independent review of JRC. Such a review was suggested by the assistant commissioner for quality assurance to the commissioner because she alleged that prior evaluations, including the certification reports of 1991 and 1993, were insufficient. The judge, however, found that the Rivendell review team was anything but "independent" because the head of the Rivendell review team had previously signed a document entitled "Call to Action by Amnesty International," which equated the use of aversives with political torture. The judge found that attachments to the "Call to Action" were directed at JRC and made "serious and outrageous claims of mistreatment" by JRC. In addition, the judge concluded that the assistant commissioner for quality assurance's allegation that reports of prior review teams were not sufficient was "not truthful [because] she acknowledged that she had not even seen the 1993 certification report until sometime in April 1995." Moreover, the judge concluded that the "request for a proposal" (RFP) process whereby the assistant commissioner for quality assurance solicited bids for the independent program review was inconsistent with the Commonwealth's policy because the RFP contained only a ten-day turn-around time and was only sent to a select group of recipients.

In January of 1994, the department arranged a meeting with a New York agency that funded patients at JRC. JRC learned of the meeting and requested that a guardian ad litem

be allowed to attend. After agreeing to this request the department canceled the meeting. JRC then requested in writing that it be notified of any future meetings or telephone conferences with the New York agency. Nevertheless, department officials held a telephone conference with representatives of the New York agency without notifying JRC. On February 28, 1994, the New York agency wrote to the parents of all New York patients at JRC and told them that alternative placements for their children would be offered in New York. The judge concluded that "the meeting with New York officials was a continuation of the [c]ommissioner's campaign of interfering with JRC's relationship[s] with its funding agencies."

On February 9, 1994, the department sent JRC a letter requiring JRC to comply with twelve more conditions by May 8, 1994. If JRC fully complied, the department agreed to certify JRC for two years. One of the conditions was that JRC rewrite all of its behavior modification treatment plans (approximately fifty-five) and allow two new psychiatrists and physicians to conduct independent psychiatric and medical evaluations on every JRC patient (approximately sixty patients) within eighty days. The commissioner did not read the reports of these psychiatrists, and not one of the evaluations recommended the discontinuation of Level III treatment procedures. Moreover, the judge found that the commissioner could not identify any credible reason for the imposition of the condition regarding medical evaluations.

In the spring of 1994, the department and JRC began six weeks of intensive negotiations regarding the conditions of certification contained in the February 9, 1994, letter. An agreement was reached on July 5, 1994, in which the department extended JRC's certification to December 31, 1994. The department also agreed that the rewritten behavior modification plans would be submitted on a weekly basis. The assistant commissioner for quality assurance and a psychologist at JRC developed a prototype treatment plan based on one of JRC's most difficult patients. This treatment plan, which was approved by the assistant commissioner for quality assurance, became the model by which every other treatment plan was to be written. The department, however, later alleged that the behavior modification plans submitted by a psychologist at JRC did not comply with department regulations.

The allegation that the plans did not comply with depart-
ment regulations was made in a letter dated January 20, 1995.
This letter also purported to extend JRC's certification,
provided that six new conditions were satisfied, one of which
required JRC to discontinue Level III interventions for six
individuals, including an individual in a related case,
*Guardianship of Brandon, post* 482 (1997), a patient at JRC
who had been the subject of a recent five-day treatment plan
review by a Probate Court judge. The January 20 letter also
required that JRC discontinue the Specialized Food Program.
JRC requested mediation of the dispute but there was no re-
sponse until April 7, 1995, when a department official stated
that the department remained "open to addressing . . . any
issue JRC may have regarding the certification process." That
response, however, was meaningless because the department
decertified JRC on March 23, 1995, effective July 1, 1995. On
March 24, 1995, a preliminary injunction was entered enjoin-
ing the department from decertifying JRC.[13]

The judge interpreted the settlement agreement to require
that "decisions on treatment were reserved for the Court."
She also found that part B of the settlement agreement ap-
pointed a court monitor who was to undertake a general
monitoring of JRC's programs and to arbitrate any disputes
between the parties. Finally, the judge noted that part L of
the settlement agreement required the parties to discharge
their obligations under the terms of the agreement in good
faith. The judge concluded that, on the basis of these facts,
"[t]he provisions of the court-ordered settlement agreement
are clear and unequivocal commands which are binding on
the defendant. . . . The defendant is in contempt having
clearly and undoubtedly disobeyed the Order of this Court."[14]

1. *The contempt finding.* In order to hold a party in

---

[13]See note 4, *supra.*

[14]The department argues that the judge's "entire application of the law of
contempt to the facts of this case" consisted of these two sentences and
that therefore the judge did not make clear what conduct by the depart-
ment constituted "clear and undoubted disobedience" of the settlement
agreement. This argument is without merit. The judge made extensive
factual findings, many of which referenced the provisions in the settlement
agreement that had been violated by such actions. In addition, in the order
denying the department's motion to stay the judgment pending an appeal,
the judge further specified which of her factual findings constituted viola-
tions of the settlement agreement.

We note also that the judge denied the department's counterclaim alleg-

424 Mass. 430                                        443

Judge Rotenberg Educ. Ctr., Inc. *v.* Commissioner of the Dep't of Mental Retardation (No. 1).

contempt, the judge must find "a clear and undoubted disobedience of a clear and unequivocal command." *Warren Gardens Hous. Coop.* v. *Clark*, 420 Mass. 699, 700 (1995), quoting *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. 35, 36 (1972). See *Nickerson* v. *Dowd*, 342 Mass. 462, 464 (1961). Where the order is ambiguous or the disobedience is doubtful, there cannot be a finding of contempt. *United States Time Corp.* v. *G.E.M. of Boston, Inc.*, 345 Mass. 279, 282-283 (1963). The burden of proof in a contempt action is on the complainant to prove its case by a preponderance of the evidence. *Manchester* v. *Department of Envtl. Quality Eng'g*, 381 Mass. 208, 212 (1980). Questions of law, including the judge's interpretation of the settlement agreement, are afforded plenary review, *Warren Gardens Hous. Coop.* v. *Clark*, *supra* at 701; the judge's ultimate conclusion on the contempt finding is reviewed under the abuse of discretion standard. *Massachusetts Comm'n Against Discrimination* v. *Wattendorf*, 353 Mass. 315, 317 (1967).

The department argues that, even if the judge's findings of fact were grounded in the evidence, they would not support a judgment of contempt because they do not show any "clear and undoubted disobedience of a clear and unequivocal command." Rather, the department argues that the judge misinterpreted the settlement agreement, and that in any case, the terms of the settlement agreement are too vague and ambiguous to support a finding of contempt. We, therefore, look to the settlement agreement to determine whether the judge properly interpreted it and whether it contains a clear and unequivocal command to the department.

a. *The settlement agreement.* Part A of the settlement agreement provides: "Aversive procedures are permitted for use at [JRC] *only* when authorized as part of a court-ordered 'substituted judgment' treatment plan for an *individual* client" (emphasis added). The judge concluded, and we agree, that this provision clearly provides that the courts were to make the ultimate decision regarding individual treatment programs. See *Matter of McKnight*, 406 Mass. 787, 790 (1990) (stating JRC and department had "settlement agreement concerning . . . authorization, by way of substituted judg-

---

ing that JRC had violated the settlement agreement. The department does not appeal from the decision denying the counterclaim.

ment, of the use of aversive procedures on clients at [JRC]"). Thus, a petitioner seeking authorization to use aversive treatments must present evidence that an individual would, if competent, consent to the aversive treatment. *Commonwealth v. DelVerde,* 398 Mass. 288, 295 (1986).[15] If the judge so finds, an order is entered authorizing the use of such treatments. *Superintendent of Belchertown State Sch.* v. *Saikewicz,* ·373 Mass. 728, 757 (1977) ("[s]hould the probate judge then be satisfied that the incompetent individual would, as determined by the [substituted judgment proceeding], have chosen to forgo potentially life-prolonging treatment, the judge shall issue the appropriate order").

This requirement is consistent with the department's regulations, which also provide that a judge, through substituted judgment proceedings, must authorize aversive treatments if an individual cannot give informed consent.[16] Furthermore, it has long been established that the courts are the appropriate bodies to make such decisions for individuals who cannot make those decisions for themselves. See *Matter of Spring,* 380 Mass. 629, 635 (1980) (stating that "we disapprove[] the delegation of the ultimate decision-making responsibility to any committee, panel or group, ad hoc or permanent"); *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 759 ("[S]uch questions of life and death seem to us to require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of

---

[15]Evidence considered at a substituted judgment hearing includes the ward's expressed preferences regarding treatments, the ward's religious convictions, the impact on the ward's family, the probability of adverse side effects, and the prognosis with and without treatment. *Guardianship of Roe,* 411 Mass. 666, 673 (1992), and cases cited. In addition to the information ordinarily presented at a substituted judgment proceeding, the settlement agreement mandated that JRC present eleven additional pieces of information as well, including evidence of the client's present and past psychological and medical circumstances, target behaviors to be treated by means of aversive procedures, the clinical reasons why nonaversives or less intrusive aversive procedures are inappropriate, and the professional disciplines of the staff members who will implement such aversive or extraordinary procedures.

[16]The regulations state that "a Behavior Modification plan employing Level II or Level III Interventions may not be implemented unless it has been consented to in accordance with the following requirements." 115 Code Mass. Regs. § 5.14 (4) (e). The "requirements" provide that, if an individual is not capable of giving informed consent, a judge, through a substituted judgment proceeding, must authorize aversive treatments. *Id.*

government was created. Achieving this ideal is our responsibility and that of the lower court, and is not to be entrusted to any other group purporting to represent the 'morality and conscience of our society,' no matter how highly motivated or impressively constituted").

That the settlement agreement reserved to the judge the ultimate decision on an individual's treatment does not mean, however, that the department gave up its regulatory authority over JRC's programs and facilities.[17] Indeed, there is no provision in the agreement that provides the department gave up any regulatory authority.

In fact other provisions of the settlement agreement provide the contrary. The plain language of part C of the agreement provided that the Department of Mental Health (the department's predecessor) was to license JRC's facilities.[18] The settlement agreement also requires that JRC continue to follow all applicable regulations concerning periodic review of individualized educational plans and individual service plans. We note also that, to read the agreement as a delegation of all regulatory authority, would implicate serious constitutional issues.[19]

The settlement agreement, like the regulations, recognizes the judge's authority to protect the legal rights of the patients by making the ultimate treatment decisions for individuals

---

[17]The judge made no explicit finding regarding whether the settlement agreement contemplated that JRC would no longer be regulated by the department.

[18]The court monitor testified that, while the licensing process and the certification process evolved into two separate concepts after the settlement agreement was reached, with licensing pertaining to the operation of facilities and certification pertaining to a facility's use of Level III aversives, he discussed certification with the department because "the [s]ettlement [a]greement required that [JRC] become licensed and because certification was part of the overall licensing process."

[19]We do not consider whether the portion of the agreement providing that it was the court monitor, not the department, that was to oversee compliance with all other applicable State regulations except those related to Level III aversives and undertake general monitoring of JRC's treatment and educational program constituted an impermissible delegation of regulatory authority. The findings of the judge with respect to this portion of the settlement agreement are not necessary for our decision here; we note, moreover, that neither side disputes that JRC was required to be certified according to the department's regulations, and it is that certification process and its relationship to the settlement agreement that is before us.

while reserving to the department regulatory authority over JRC's program and facilities. This distinction between individual treatment plans and treatment programs, however, need not conflict. Any significant changes relating to an individual's treatment, such as the decertification of the program, can be brought to the attention of the judge, who can then modify the substituted judgment order. See *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 730-731 n.3 ("we emphasize that upon receiving evidence of a significant change either in the medical condition of Saikewicz or in the medical treatment available to him for successful treatment of his condition, the probate judge may issue a further order"). See *Brophy* v. *New England Sinai Hosp., Inc.,* 398 Mass. 417, 442 n.41 (1986) ("the new judgment should, of course, include a provision for modification . . . should any significant change or developments ensue"). Indeed, to ensure that treatment plans authorized by the judge are properly implemented, we have stated that a "judge may delegate to a guardian the power to monitor the treatment process to ensure that the substituted-judgment treatment plan is followed." *Rogers* v. *Commissioner of the Dep't of Mental Health,* 390 Mass. 489, 504 (1983). The settlement agreement itself provided that the court monitor would report to the judge regarding JRC's adherence to the treatment plan; thus, the department's arguments that such a reading of the settlement agreement would allow JRC to implement aversive treatments without regulation are without merit.

We recognize, of course, that "[a] court . . . may not properly exercise the functions of the executive branch of State government." *Care & Protection of Isaac,* 419 Mass. 602, 605 (1995), quoting *Matter of McKnight,* 406 Mass. 787, 792 (1990). See *Guardianship of Anthony,* 402 Mass. 723, 727 (1988). Indeed, it is fundamental that a judge's order should and could not ignore the department's authority regarding certification requirements or compliance with applicable regulations. To do so would violate the principles of separation of powers by usurping an executive function. *Charrier* v. *Charrier,* 416 Mass. 105, 110 (1993). It is not usurping an executive function, however, to require that the judge's order, authorizing the use of certain treatments entered at the time a program is certified to use aversive treatments, cannot be unilaterally overridden by an executive agency. Indeed, allow-

ing the department to ignore a judge's order would intrude on the function of the courts, for there is no doubt that the ability to enter orders is necessary to the very existence of the court and essential to the maintenance of the court's authority. *Attorney Gen.* v. *Sheriff of Suffolk County*, 394 Mass. 624, 631 (1985) ("court must have power to carry out its obligation[s]"). It is just this sort of intrusion that art. 30 of the Massachusetts Declaration of Rights prohibits. *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n*, 404 Mass. 53, 56 (1989). Thus, requiring the department to seek to modify the original treatment orders before instituting any change respects the power and authority of both the executive and judicial branches of government.[20]

Thus any unilateral interference by the department in a court-ordered treatment would support a contempt finding. It is not decisive that the agreement did not mention the department by name, for by becoming a party to an agreement that clearly provided that *only* the judge was to make these decisions, the department was bound not to interfere with individual treatment plans authorized by the judge. See *Labor Relations Comm'n* v. *Boston Teachers Union, Local 66*, 374 Mass. 79, 89 (1977) (rejecting argument that legal liability cannot attach for failure to comply with implicit requirements). Cf. *Bird* v. *Capital Site Mgt. Co.*, 423 Mass. 172, 178 (1996) ("A person who was not a party to an action in which

---

[20]Contrary to the department's argument, its own regulations do not contemplate its having such unilateral power over individual treatment plans. While the department argues that language in the policy section of the applicable regulations stating that "[t]he use of such procedures for a particular individual will be allowed for a particular client only after a rigorous review and approval by clinicians, human rights committees, and the department" and that "such procedures are only to be used in programs which are specially qualified and certified to use such procedures with appropriate care . . . [and] the application of a procedure for clients even after it has been approved must be strictly monitored by the program as well as by the [d]epartment itself" demonstrate its power over individual treatment plans, we conclude that the language is consistent with our reading of the regulations — if that monitoring reveals any problems, that information should be brought to the judge who has authorized the use of aversive treatments. 115 Code Mass. Regs. § 5.14 (1) (c). Moreover, although the department claims to have certified the use of aversive therapies on individual patients at various facilities, the assistant commissioner for quality assurance conceded that there is no authority in the regulations for approval of Level III procedures "in the absence of a certification as a program."

an order was entered may in certain circumstances be found to be in contempt of that order").

b. *Bad faith*. Having concluded that the department's interference with individual treatment plans can support a finding of contempt, we look next at the findings of the department's bad faith regulatory practices. The agreement states that "each party shall discharge its obligations under the terms of this agreement, in good faith." The department argues that, because no other provisions in the agreement speak to how the department is obligated to regulate JRC, there can be no violation of the good faith clause. Indeed, according to the department, any findings relating to the certification process are "immaterial" and cannot support a finding of contempt because, absent such a provision, there cannot be a "clear and undoubted disobedience of a clear and unequivocal command." *United Factory Outlet, Inc. v. Jay's Stores, Inc.*, 361 Mass. 35, 36 (1972). We disagree, leaving aside the implication of the argument that there is no obligation on the part of the department apart from the agreement to regulate in good faith.

It should be kept in mind also that, in the litigation that the agreement sought to settle, the court had found that the department's predecessor had engaged in bad faith regulation of JRC. It is in this context that part L of the settlement agreement must be read. *United States* v. *Board of Educ. of Chicago*, 799 F.2d 281, 292 (7th Cir. 1986) (good faith provision cannot be read in vacuum). Where, as here, the agreement as a whole contemplates that the department will continue to regulate JRC, see note 17, *supra*, and contains a good faith provision, the provision applies to the regulation of JRC by the department and is not so ambiguous as to preclude a finding of contempt. Indeed, while we have refused to hold a defendant in contempt if, in order to do so, we would have to expand the scope of an underlying order beyond its plain meaning, *Peggy Lawton Kitchens, Inc.* v. *Hogan*, 403 Mass. 732, 734-735 (1989), we have upheld findings of contempt where an order, although subject to some legal interpretation, has nonetheless provided sufficient notice to the party bound by the order that its actions could form the basis for contempt. *Nickerson* v. *Dowd*, 342 Mass. 462, 464-465 (1961) ("lawful" operation of business, while confusing term, nonetheless sufficient basis for contempt proceedings). A

424 Mass. 430                                                          449

Judge Rotenberg Educ. Ctr., Inc. *v.* Commissioner of the Dep't of Mental Retardation (No. 1).

"good faith" provision, while subject to some legal interpretation, is certainly not so ambiguous as to fail to put the department on notice that improper regulation of JRC could subject it to contempt proceedings. Indeed, good faith provisions are implied in all contracts, *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991), and ensure that the substance and purpose of the agreement is given effect. *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting *Kerrigan* v. *Boston*, 361 Mass. 24, 33 (1972).

Not only is a contempt finding appropriate because the department did not regulate JRC in good faith, a contempt finding is appropriate where "steps are taken to subvert the decree." *United States* v. *Board of Educ. of Chicago, supra* at 296. Thus, while judges will not read into an order additional terms, *Peggy Lawton Kitchens, Inc.* v. *Hogan, supra* at 734-735, judges will not allow a party to do indirectly what an order makes clear he cannot do directly. *Stodder* v. *Rosen Talking Mach. Co.*, 247 Mass. 60, 68 (1923) ("[c]ourts will not permit defendants to evade responsibility for violating an injunction, by doing through subterfuge a thing which is not in terms a violation, yet produces the same effect by accomplishing substantially that which they were enjoined from doing"). See *Labor Relations Comm'n* v. *Boston Teachers Union, Local 66, supra* at 89-90 (where defendants enjoined from taking affirmative action to encourage labor strike, provision of order enjoining them from condoning such action was sufficiently clear to put them on notice that failure to act in appropriate situations would render them liable). To allow such behavior would undermine the efficacy of court decrees and allow anyone to flout the judicial branch. In the instant case then, it would be absurd to conclude that, although the agreement was intended to settle claims that the department's predecessor was improperly denying the patients needed aversive therapy, the department could, through bad faith regulatory practices, ensure that no individual could receive aversive therapies at JRC.

While we agree that part A and part L of the settlement agreement provided "clear and unequivocal command[s]" that would support a finding of contempt, we doubt whether the "impermissibly obstructed" language of part C and the arbitration provisions of part B-2 can be similarly character-

ized. Because we conclude that contempt was justified apart from these provisions, we do not rely on these provisions of the settlement agreement in reaching our decision.

We reach our decision, as we must in a contempt action, based on the plain language of the settlement agreement. See *Inspector of Bldgs. of Provincetown* v. *Eder,* 11 Mass. App. Ct. 1011 (1981). We note, however, that the circumstances and history surrounding the settlement agreement and the ensuing relationship between the department and JRC supports our reading of the settlement agreement.[21] The action that resulted in the settlement agreement was brought because the parents and guardians of JRC patients alleged that OFC was denying individual patients their constitutional rights to certain treatments and was not regulating JRC in good faith. The settlement agreement sought to remedy this situation while allowing the department to continue to fulfil its statutory duties to regulate mental health facilities.

In sum, we have considered the many arguments the department makes with respect to the settlement agreement, and conclude that the settlement agreement was not, in significant respects, too ambiguous to support a finding of contempt. Indeed, while we are sensitive to the fact that "[a]mbiguity lurks in generality and may thus become an instrument of severity," *Labor Relations Comm'n* v. *Boston Teachers Union, Local 66, supra* at 89, quoting *McComb* v. *Jacksonville Paper Co.,* 336 U.S. 187, 297 (1949) (Frankfurter,

---

[21]For example, in March of 1992, the department's general counsel responded to a letter inquiring about JRC's use of behavior modification procedures with respect to two patients and stated that "the [d]epartment is currently bound by a settlement agreement with respect to this program. All so-called aversive interventions used at [JRC] must be approved by the Bristol County Probate Court; the [d]epartment's involvement in the actual treatment is limited." In addition, after initially granting certification to JRC on April 20, 1989, the department attached to the initial grant of certification a memorandum which addressed the potential conflict between substituted judgment orders of the Probate Court and the department regulations. The memorandum noted that the department's treatment plans should not be amended until after a substituted judgment hearing before the Probate Court, and stated that such interpretation of the regulations "is necessary to prevent conflicting decisions by departmental hearing officers and the Probate Court, [because] obviously an executive branch hearing officer cannot overrule a court decision." The memorandum also noted that such a practice was "consistent with departmental practice in [other] cases."

J., dissenting), such danger is not presented by upholding the contempt findings in this case. Finally, we note that the settlement agreement has been in effect since 1986. If the department had felt that the agreement did not clearly define what it could or could not do, the proper remedy would be for the department to have brought an action asking for clarification of the order. *Id.* at 91, citing *Coyne Indus. Laundry of Schenectady, Inc.* v. *Gould,* 359 Mass. 269, 275-276 (1971).

c. *Whether the judge was warranted in finding contempt.* Having concluded that the settlement agreement provided clear and unequivocal commands, the next question is whether there was "clear and undoubted disobedience" of those commands.

In general, a judge's findings of facts in a contempt proceeding are reviewed using the "clearly erroneous" standard. Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). The department argues, however, that, while the clearly erroneous standard is generally the applicable standard, the circumstances of this case call for the standard to be applied more strictly. We disagree. While it is true that stricter scrutiny may be warranted in cases where the judge's findings fail to evidence a "badge of personal analysis," in the instant case, the findings of the judge "so revised [JRC's] proposed findings and conclusions 'that it is clear that the findings are the product of [her] independent judgment.' " *Anthony's Pier Four, Inc.* v. *HBC Assocs.,* 411 Mass. 451, 465 (1991), quoting *Cormier* v. *Carty,* 381 Mass. 234, 237, 238 (1980). Contrary to the department's claim, the judge did not adopt the proposed findings of JRC and make "virtually no changes of any substance in adopting these findings." Rather, JRC proposed many findings that the judge refused to adopt, and she heavily edited many of the findings suggested by JRC. The judge also rejected certain characterizations suggested by JRC. Moreover, she accepted proposed findings of fact from both JRC and the department, and while the judge incorporated few, if any, of the department's proposed findings, that is a proper exercise of her role as fact finder as long as her findings are supported by the evidence. Indeed, the conclusions of law section of the judge's decision "leaves no doubt that the judge adopted the findings proposed . . . because they accurately expressed [her] decision after [her] consideration of the evidence and [her] evaluation of the credibility of the witnesses." *Edinburg* v. *Cavers,* 22 Mass. App. Ct. 212, 219 (1986).

What the clearly erroneous standard means is that "[the judge's] findings 'come here well armed with the buckler and shield.'" *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621 (1985), quoting *Matter of Multiponics, Inc.*, 622 F.2d 709, 723 (5th Cir. 1980). We are "bound by [her] findings of fact which are supported by the evidence, which include inferences reasonably drawn therefrom." *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 405 (1982). Thus, we shall not "review questions of fact found by the trial judge, where such findings are supported 'on any reasonable view of the evidence, including all rational inferences of which it was susceptible.'" *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank, supra* at 624, quoting *T.L. Edwards, Inc.* v. *Fields*, 371 Mass. 895, 896 (1976). Moreover, while there is substantial documentary evidence before us, there is also significant oral testimony, including oral testimony about those documents, and "[w]hen the evidence is of mixed character — live and documentary — it is settled that the clearly erroneous standard applies to both categories." *Cornwall* v. *Forger*, 27 Mass. App. Ct. 336, 338 (1989). Finally, our standard of review also does not change because of the subject matter of the findings and the severity of the relief predicated on them.

With the appropriate standard in mind, we now review the evidence to determine whether a finding of contempt was warranted. It is not necessary for us to review all 304 findings that led to the contempt order. Rather we think it appropriate to review some of the most egregious behavior of the commissioner and the department that warranted the contempt finding and the remedies imposed by the judge.

d. *Part A of the settlement agreement.* The judge found that the department violated part A of the agreement by, inter alia, ordering JRC by letter dated January 20, 1995,[22] to discontinue use of court-authorized procedures for six JRC patients.[23] The department argues that the judge mischaracterized the condition in the letter requiring JRC to discontinue

---

[22]The letter stated: "This certification excludes authorization for [JRC] to continue to use indefinitely Level III interventions for six individuals . . . ."

[23]One of the individuals had been the subject of a recent five-day treatment plan review by the Probate Court. The Probate Court judge had conducted a treatment plan review, commencing on October 31, 1994, and

Level III interventions for the six patients. Rather, the department argues that the letter gave JRC the choice of revising the treatment plans either to conform to the department's regulations (and to apply for recertification) or to exclude Level III aversives. The department also argues that the existing treatment plans were to remain in effect until new plans were approved in accordance with the department's regulations, including those regulations that required a substituted judgment proceeding.

It is true that the letter of January 20, 1995, gave an option; the option, however, was not the department's to give. The *settlement agreement* (and the department's own regulations, 115 Code Mass. Regs. § 5.14 [4], [5]) makes clear that the judge was to make the ultimate decision regarding the treatment plan of individuals. See *supra* at 18-20. As discussed previously, if the department had new information, i.e., that the program was no longer certified, the proper course would be to bring that new information to the judge. It was not to contradict the judge's orders which authorized certain treatments and order JRC, who had authorization to use aversive therapies for individual patients, to go back to the judge with new treatment plans or to modify treatment plans so as to exclude aversive therapies. Indeed, the letter mandated that if, after thirty days, JRC did not apply to be recertified in the use of Level III interventions for the six individuals, JRC must begin modifying the treatment plans to exclude Level III aversives. That the department may or may not have been acting in good faith is irrelevant — good faith is not a defense to a charge of contempt. *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. 35, 38 (1972) ("good faith," "absence of wilful disobedience," and "lack of intent to violate a decree do not constitute a valid defence for a corporation charged with civil contempt"). Thus, the judge's conclusion that the department violated part A of the settlement agreement by interfering with the treatment plans of six individuals is not clearly erroneous.

e. *Part L of the settlement agreement.* The judge found that part L of the settlement agreement was violated when the

concluding December 21, 1994, specifically approving Level III aversive therapy for the individual who was one of the most difficult to treat patients at JRC. See *Guardianship of Brandon, post* 482 (1997). See also note 19, *supra.*

commissioner "departed from ordinary Department practice by . . . holding weekly meeting[s] with high-level staff to discuss JRC." At these meetings, "a plan was formulated to disrupt the operations of JRC by every conceivable means — to allege that clients were being abused; to interfere with financial operations; to disrupt JRC's relationships with funding agencies, as well as parents; and other activities which have absolutely no bearing on the legitimate exercise of regulatory authority." Moreover, the judge concluded that the commissioner, who testified that the meetings were held strictly to deal with the recertification issue, tried to conceal the true purposes of these meetings.

Clearly, a finding that the department developed and acted on a plan to interfere with JRC and put it out of business would warrant the conclusion that the department was regulating JRC in bad faith, for it "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will." *Hartford Acc. & Indem. Co.* v. *Millis Roofing & Sheet Metal, Inc.*, 11 Mass. App. Ct. 998, 999-1000 (1981), citing *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 416-417 (1937). Indeed, if the judge's findings of fact are not clearly erroneous, then "bad faith can reasonably be inferred from the evidence." *Chapman* v. *University of Mass. Medical Ctr.*, 417 Mass. 104, 110 (1994). The department argues, however, that the judge erred in concluding that the commissioner attempted to conceal the subject of these meetings from the judge and that the judge's findings on this subject form the basis for her conclusions of perjury, government malfeasance, and attorney misconduct.

Our review of the evidence leads us to conclude that the judge was warranted in finding that the commissioner did in fact testify that the meetings were held to deal strictly with certification issues.[24] Regardless, however, whether the commissioner attempted to conceal the subjects of these meetings, it is clear that the testimony at trial warranted a finding that

---

[24] Q.: "Commissioner, starting in the summer or fall of 1993, you started having weekly meetings concerning [JRC]'s application for certification; is that correct?"

A.: "Yes."

Q.: "Those meetings dealt strictly with the issue of [JRC]'s application for certification?"

the department had developed and acted on a plan to put JRC out of business and was regulating JRC in bad faith, and it is this conclusion that warrants a finding of contempt and the imposition of a receivership.

Work plans and notes taken at these meetings included the notations "December 15 - [JRC] D-Day" and "what would [JRC] have to do to *not* be certified: two areas a capacity to obey laws and efficacy of treatment" (emphasis in original). There was also an agenda item on the issue of how Rhode Island was able to remove patients from JRC and "turn over its clients to [another facility]." In addition, the work plan agenda also reveal that the commissioner, contrary to department policy, was to brief a District of Columbia official on the status of an investigation of a patient at JRC before the investigation was complete, and that the commissioner's special assistant was to develop other contacts with out-of-State funding agencies. Indeed, the commissioner and his special assistant were assigned the task of researching whether Washington, D.C., had alternate placement plans for the JRC patient. The work plans also reveal that the department was researching former JRC staff and planned to distribute profiles on seven Massachusetts citizens who had transferred out of JRC. Based on this evidence, the judge's conclusion was not clearly erroneous that the work plans reflected a strategy to interfere with JRC's relationships with funding agencies.

There was also ample evidence to support the judge's finding that the department planned to interfere with JRC's financial operations. The work plans reveal that, at these meetings, the commissioner undertook the task of confirming JRC's fiscal status even though the commissioner testified that a review of JRC's fiscal status had nothing to do with

---

A.:    "Yes."

Q.:    "They were not assembled for any other purpose?"

A.:    "That's correct."

While the judge concluded that the "materially false statements under oath . . . would support a prosecution for perjury" and referred "the matter to the District Attorney . . . for a determination as to whether a prosecution for perjury and/or criminal contempt should be instituted," we need not consider whether the evidence would support a perjury charge.

certification. An attorney, who was retained by the department to assist with JRC's certification application and was made a special assistant attorney general, was instructed to run title searches on all JRC property in order to determine whether there were any undisclosed related party transactions, even though the commissioner testified that he had no basis to believe there were any such transactions and conceded that the issue is the responsibility of the division of purchased services and not the department. The commissioner also testified that whether JRC property was leased or owned, had nothing to do with the issue of certification yet the assistant commissioner for quality assurance was assigned the task of determining whether JRC's property was leased or owned.[25] Finally, the work plans reveal that the department attempted to interfere with the rate at which JRC was reimbursed by the division of purchased services by arguing that the department and JRC should negotiate a rate for reimbursement rather than having the rate set by the division of purchased services and by arranging an unlawful "pre-meeting" between the department, the division of purchased services, and the Department of Education before JRC met with the division of purchased services and the Department of Education officials for a pricing meeting.

Based on the testimony and the "work plans" of the Tuesday morning meetings, there is no doubt that the judge's conclusions that the Tuesday morning meetings involved activities which had nothing to do with the certification (or regulatory) process and that the department developed a plan to put JRC out of business through interfering with JRC's relationships with funding agencies and JRC's fiscal operations are not clearly erroneous. Indeed, the work plans reveal that less than two months after the second review team had recommended that JRC be recertified, the department wanted

[25]While the department argues that all 304 findings of fact are clearly erroneous, nowhere in its brief does it challenge the findings that these topics were, in fact, discussed at the meetings, and that the commissioner testified they did not have anything to do with certification. Rather, the department tries to sidestep the issue, arguing only that the commissioner never claimed not to have discussed these issues and therefore cannot be found to have acted in bad faith. The department's argument ignores that it is not solely the commissioner's denial or admission of these actions that warranted a finding of contempt — it was the actions themselves that demonstrated the department was regulating the JRC in bad faith.

a receivership petition prepared in case JRC went out of business.[26] Moreover, while the department argues "despite whatever the [c]ommissioner and his staff may have discussed, planned, or desired, they did not close down [JRC], put it into receivership, or put it out of business," there is ample evidence to support the judge's conclusion that the commissioner interfered with JRC's operations without justification.

Further evidence of the department's plan to shut down JRC is found in its imposition of "a severe and essentially constant burden on the JRC staff by having to respond to an unrelenting stream of bad faith regulatory demands and other bad faith conduct." Examples of the regulatory barrage launched by the department include demanding that JRC psychologists rewrite fifty-two behavior modification treatment plans that had previously been approved by the judge, requiring JRC to respond to fifty-six medical and forty-two psychiatric evaluations written by the psychiatrists and physicians retained by the department to examine all of the JRC patients "without an analysis or even regard to whether any of these were clinically indicated," requiring JRC to provide a "list of aversive techniques and an existing description of how such techniques are used at JRC" even

---

[26]The department argues that the information regarding the receivership petition revealed by the work plans is protected by the attorney-client privilege. We agree with the judge that the information is not protected by the privilege. The attorney-client privilege protects communications made between a lawyer and a client for the purpose of obtaining legal advice. See *Purcell* v. *District Attorney for the Suffolk Dist., ante* 109, 115 (1997); *Rent Control Bd. of Cambridge* v. *Praught*, 35 Mass. App. Ct. 290, 296 (1993). We must, however, construe the privilege narrowly. *Commonwealth* v. *O'Brien*, 377 Mass. 772, 775 (1979). Thus, while the department analogizes to *Upjohn Co.* v. *United States*, 449 U.S. 383 (1981), where the Supreme Court recognized that for a corporate lawyer to function effectively, it is often necessary for the lawyer to obtain information from middle and lower-level employees in order to advise the corporation appropriately, *id.* at 394, that case is inapposite where, as here, there has been no showing that all of those present at the meeting provided the department's counsel with information she needed in order to advise the department, nor has there been a showing that all those present at the meeting were seeking legal advice. Rather, the evidence overwhelmingly supports the conclusion that the meeting was a general policy meeting. Thus, while the documents would be protected from mandatory disclosure during the time the policy was being developed, G. L. c. 4, § 7, Twenty-sixth (*d*); *Babets* v. *Secretary of Human Servs.*, 403 Mass. 230, 237 n.8 (1988), after the policy decision has been made there is no privilege. *Id.* at 238-239.

though this information was already given to a review team," and instigating more than fifty abuse investigations.

The department argues that there was a good faith basis for requiring JRC to conduct independent psychiatric and medical reviews for all its patients. It was appropriate for the judge to conclude otherwise. The commissioner testified that no psychiatrist gave him any information which suggested a need for psychiatric evaluations or information that the client's behavioral problems could be treated psychiatrically. Moreover, the commissioner could not identify any physicians who had advised the department that there were unmet medical needs, and concurred that all JRC patients were in good health. Perhaps most telling, the commissioner testified that he had never read any of the reports written by the psychiatrists that the department had retained to examine JRC patients.

In addition to requiring JRC to respond to numerous requests for documents, the judge concluded that the regulatory barrage included numerous visits to JRC by department officials and others which distracted JRC staff from working with patients. Indeed, the judge found that, from late October through the end of December 1994, "JRC was besieged with visits . . . . From August of 1993 to December of 1994, there were over 400 visits . . . ."

One such visit was by the Rivendell review team during the week of March 20, through March 25, 1994. The judge concluded that the "selection of Rivendell was the antithesis of a fair, unbiased and independent review. [The department's] selection of Rivendell was purposeful and is an example of bad faith."[27] The judge was warranted in concluding that the selection of the Rivendell review team constituted bad faith regulation of JRC. Given that the team leader was the first individual signatory to the "Call to Action" which equated aversive therapies to political torture, the judge's conclusion that the Rivendell review team was incapable of doing an unbiased review was not clearly erroneous. Indeed, the attachments to the "Call to Action" made serious claims of mistreatment by JRC. The judge, having heard testimony that the assistant commissioner for quality assurance had received a copy of the "Call to Action" which equated the

---

[27]The judge also noted that the Rivendell review team requested indemnification from the department for its review of JRC.

use of aversives with political torture, was not required to believe the assistant commissioner for quality assurance's testimony that she believed the Rivendell team leader was impartial. See *Hawthorne's Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 201 (1993) (judge in best position to evaluate credibility of witnesses); *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621 (1985) (due regard given to opportunity of judge to assess credibility of witnesses). Moreover, the judge's disbelief of the assistant commissioner for quality assurance's testimony was not the only basis for her conclusion that the selection of Rivendell was made in bad faith. The judge also found that the Rivendell review team was selected without the department receiving the resumes of the professionals involved. In addition, the judge found that the assistant commissioner for quality assurance requested that Rivendell modify the original RFP that it had submitted and that the original RFP stated that "[t]he assembly of a sufficiently qualified team at such short notice is close to impossible." Moreover, the original RFP revealed that the bid submitted by the Rivendell team was one and one-half times higher than the only other bid. Our review of the evidence demonstrates that none of these findings was clearly erroneous, and that the judge was warranted in concluding that the department was regulating JRC in bad faith.[28]

The department argues that the judge impermissibly imposed the burden on the commissioner to prove that he

---

[28]Other examples of the department's putting its plan into action include the letters sent by the department to the funding agencies which contained misleading and false information. The department argues that the commissioner had a good faith basis for all of the statements and the conditions contained in the various letters. While we need not review all of the letters, we note, for example, that the letter of August 6, stated that the department had found "continued and repeated noncompliance with [the department] regulations." Our review of the evidence leads us to conclude that the judge's finding that the letter was sent in an attempt to interfere with JRC's relationships with funding agencies was not clearly erroneous. Indeed, this statement was in direct conflict with the report of the 1993 review team that had been submitted just a few weeks prior to the August 6 letter and the 1991 report, both of which the commissioner testified that he had not read at the time he sent the letter. Moreover, the commissioner was asked, "[W]ould it be fair to state that you . . . did not review the reports of your certification team, you did not review the court orders of the Bristol County Probate Court and you did not review any of the evaluations of the psychologists who had been appointed by the [department]; is that a fair statement?" He responded, "Yes." Thus, it is clear that there is

acted in good faith and that, where the defendant is a State official, "who is attempting to carry out his statutory duties as he understands them, contempt sanctions are not an appropriate means of redressing any violation of his obligation to act in good faith," and raises serious separation of powers problems. The department argues that the judge should have assumed that the commissioner would henceforth act in accordance with the law as judicially construed. We disagree.

Our review of the record leads us to conclude that the judge did not impermissibly shift the burden to the department to prove that the commissioner acted in good faith. While the judge did at times ask the commissioner what his good faith reason was for taking certain actions, these questions generally came after affirmative evidence suggesting bad faith had been admitted, and reflected the judge's efforts to get the commissioner's response.[29] Moreover, the judge, in finding bad faith, did not merely rely on her disbelief of the testimony of the commissioner and other witnesses of the department. Contrast *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 223-224 (1992). The work plans and other documents, as well as the testimony, provided the judge with an ample basis for making the findings she did.

Finally, the department's argument that contempt sanctions are inappropriate has no merit. It is, of course, generally true that, absent a statute imposing an affirmative obligation to act in good faith, "acts of administrative officers cannot be attacked in judicial proceedings on the ground that in fact those officers were not governed by the highest standards of impartial and unselfish performance of public duty," *Brennan* v. *The Governor*, 405 Mass. 390, 397-398 (1989), quoting *Kelley* v. *School Comm. of Watertown*, 330 Mass. 150, 154 (1953), for there is every presumption that public officials are

ample evidence to support the inference that the letter was sent in bad faith as part of the plan to put JRC out of business.

[29]For example, on the first day of trial, the assistant general counsel testified that the 1993 review team's report and the 1991 review team's report were not submitted to the judge on September 22, 1993, when the department submitted other information. The judge, on learning that these favorable reports had not been presented to her stated: "My mind is always open to what you present me. But I'm faced with misrepresentations to the Court and I welcome an explanation as to why it should not be characterized in that way and I am looking forward to it and I hope that it's presented soon."

424 Mass. 430                                                    461

Judge Rotenberg Educ. Ctr., Inc. *v.* Commissioner of the Dep't of Mental Retardation (No. 1).

motivated to act honestly and appropriately. *LaPointe* v. *License Bd. of Worcester*, 389 Mass. 454, 459 (1983). Here, however, there was an independent agreement incorporated as an order of the court that required the department to act in good faith, and it is well settled that contempt sanctions are an appropriate mechanism by which "the power of the court [can] secure to the aggrieved party the benefit of the decree." *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. 35, 36 (1972). Moreover, while "[t]he tradition of judicial deference to agency decision making represents an important social policy decision that public agencies are generally in a better position than courts to make particular technical decisions . . . this policy rests on an assumption that public agencies will act properly when making the decisions," *Matter of McKnight*, 406 Mass. 787, 807 (1990) (Liacos, C.J., dissenting), and in the instant case, there was ample evidence to rebut any presumption that the department was acting in good faith.

2. *Evidentiary errors.* The department argues that, not only are the findings of fact clearly erroneous, certain evidentiary errors warrant reversal. We disagree.

a. *Failure to extend discovery.* The department argues that the judge erred in denying a motion to extend discovery, which would have given it the opportunity to depose JRC's accountant on matters germane to JRC's financial condition.[30] We disagree. "The conduct and scope of discovery is within the sound discretion of the judge." *Solimene* v. *B. Grauel &*

---

[30]Pursuant to Mass. R. Civ. P. 30 (b) (6), 365 Mass. 780 (1974), the department requested JRC to produce "the person with the most knowledge with regard to the factual basis for the allegations contained in the Third Amended Complaint." In response, JRC produced the executive director of JRC, who testified about matters germane to the complaint, but claimed to have no particularized knowledge relevant to JRC's financial condition. Discovery ended before the department could depose anyone who had particularized knowledge; the judge denied the department's motion to extend discovery beyond May 18, 1995.

The department failed to state with particularity in its original request under rule 30 (b) (6), its desire to depose someone with particularized knowledge concerning JRC's financial condition. See *Mitsui & Co. (U.S.A.)* v. *Puerto Rico Water Resources Auth.*, 93 F.R.D. 62, 66 (D.P.R. 1981). Given the broad net cast by the department's request for "the person with the most knowledge with regard to the factual basis for the allegations contained in the Third Amended Complaint," JRC's executive director was the logical official to attend the deposition.

*Co., KG*, 399 Mass. 790, 799 (1987). The department must show that the denial constituted an abuse of discretion which resulted in prejudicial error. *Symmons* v. *O'Keeffe*, 419 Mass. 288, 302 (1995), and cases cited. No such showing has been made. The department had notice that JRC's accountant was going to testify about its financial condition and had the opportunity to question him on cross-examination.[31] The judge was not required to extend discovery. See *Wilson* v. *Honeywell, Inc.*, 409 Mass. 803, 809 (1991) (judge properly admitted testimony of witness introduced on the first day of trial where no prejudice resulted from late disclosure). See also *Bishop* v. *Klein*, 380 Mass. 285, 288 (1980). Thus, we conclude there was no abuse of discretion.

b. *Admission of evidence.* Next, the department argues that the judge erred by not allowing it to introduce otherwise inadmissible evidence under the curative admissibility doctrine. We disagree. "The curative admissibility doctrine allows a party harmed by incompetent evidence to rebut that evidence only if the original evidence created significant prejudice." *Commonwealth* v. *Ruffen*, 399 Mass. 811, 813-814 (1987) (failure to permit defendant to cross-examine police officer about defendant's statements prejudicial). The department failed to show that the evidence presented by JRC, even if it were inadmissible, created significant prejudice.

During the hearing, JRC offered testimony relevant to the harm caused to two patients when the specialized food program was canceled. The judge denied the department's motion for an order requiring the guardians of those two patients to consent to an examination so that it could rebut JRC's testimony.[32] The department claims that this was prejudicial because the testimony regarding the harm to these two patients was the basis for the finding of harm. We conclude that there was no significant prejudice because the judge made numerous findings of harm on independent grounds.

Second, JRC offered testimony that the department

---

[31]JRC listed its accountant as an expert witness in its pretrial memorandum. In addition, an offer of proof as to the accountant's qualification as an expert witness was made in writing on the first day of trial.

[32]The judge denied the motion on the ground that, "This is a treatment decision which belongs in the substitute judgment process; it does not belong here."

424 Mass. 430                                463

Judge Rotenberg Educ. Ctr., Inc. *v.* Commissioner of the Dep't of Mental Retardation (No. 1).

regulated other providers differently. The department argues that the judge erred by not allowing it to introduce evidence regarding its regulation of other providers on relevance grounds. The curative admissibility doctrine, however, does not apply because JRC's evidence was not inadmissible. *Commonwealth* v. *Ruffen, supra.*

We conclude there was no abuse of discretion on evidentiary issues.

Having concluded that the judge was warranted in finding the department to be in contempt of the settlement agreement, we must now consider whether the judge ordered the appropriate remedies.

3. *Receivership.* The judge appointed a receiver to administer, manage, and operate the department in all of its relationships with JRC. The department contends that the judge erred because the facts do not justify a receivership. A narrower and more plausible contention is that the judge exceeded her authority in fashioning the receiver's powers. We shall consider each argument in turn.

a. *Facts justify a receiver.* The Probate Court is a court of limited jurisdiction, which pursuant to G. L. c. 215, § 6, has general equity jurisdiction. *Young* v. *Department of Pub. Welfare,* 416 Mass. 629, 633 (1993). A court with equity jurisdiction has broad and flexible powers to fashion remedies. *Matter of McKnight,* 406 Mass. 787, 791 (1990). Public officials who fail to abide by legal standards are not immune to these remedies. See *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1 (1971) (remedies to eliminate school segregation); *Perez* v. *Boston Hous. Auth.,* 379 Mass. 703 (1980) (receiver appointed to run public housing authority); *Blaney* v. *Commissioner of Correction,* 374 Mass. 337 (1978) (specific guidelines on treatment of prisoners). A court with equity jurisdiction has the discretion to appoint a receiver to take over the main functions of public officials. *Perez* v. *Boston Hous. Auth., supra* at 735-737. See *Lopez* v. *Medford Community Ctr., Inc.,* 384 Mass. 163, 169 (1981); *Morgan* v. *McDonough,* 540 F.2d 527, 533 (1st Cir. 1976), cert. denied, 429 U.S. 1042 (1977).[33]

"[A] receivership must be thoroughly justified on the facts,

---

[33]The power to appoint a receiver is not limited to constitutional violations. *Perez* v. *Boston Hous. Auth.,* 379 Mass. 703, 733 n.27 (1980).

is always to be considered a remedy of 'last resort,' and therefore is not often applied in practice." *Perez* v. *Boston Hous. Auth., supra* at 733-737. The test is one of reasonableness in the circumstances. *Id.* at 735-736. *Morgan* v. *McDonough, supra* at 533. In *Perez,* a combination of circumstances justified a receivership: "repeated or continuous failure of the officials to comply with a previously issued decree; a reasonable forecast that the mere continued insistence by the court that these officials perform the decree would lead only to 'confrontation and delay'; [and] a lack of any leadership that could be expected to turn the situation around within a reasonable time." *Perez* v. *Boston Hous. Auth., supra* at 736. See *Morgan* v. *McDonough, supra* at 533. The judge may also consider bad faith and wasting of resources. See *Perez* v. *Boston Hous. Auth., supra* at 724-725, 737; *New England Theatres, Inc.* v. *Olympia Theatres, Inc.,* 287 Mass. 485, 492 (1934), cert. denied sub nom. *E.M. Loew's, Inc.* v. *New England Theatres,* 294 U.S. 713 (1935). In general, the more indurated the problems and less likely that intermediate steps will work, the greater the justification for a receivership. *Perez* v. *Boston Hous. Auth., supra* at 734.

We conclude that a receivership was justified in the circumstances of this case. The findings that the department repeatedly violated the settlement agreement, interfered with court-authorized treatment orders,[34] bypassed the court-appointed monitor,[35] and knowingly misled the judge,[36] warranted a conclusion that the department was unwilling to comply with a judicial decree. The department's refusal to acknowledge any wrongdoing in the contempt action indicated that less stringent remedies would only invite further

---

[34]In the January 20, 1995, letter, the commissioner ordered JRC to discontinue court-authorized aversive therapy for six patients.

[35]The commissioner did not apprise the judge or the court monitor of the serious allegations made in the August 6, 1993, letter. He considered contacting the court monitor prior to writing the letter, but elected not to do so. The department argues that this finding is clearly erroneous because the department had no obligation to bring these matters to the attention of the judge. This argument does not attack the factual finding itself but is directed to the significance of the finding.

[36]On September 22, 1993, the department filed a report to the judge regarding the status of JRC. This report failed to contain two certification team reports dated December 21, 1991, and July 15, 1993, which recommended that the department certify JRC.

424 Mass. 430                                                465

Judge Rotenberg Educ. Ctr., Inc. *v.* Commissioner of the Dep't of Mental Retardation (No. 1).

confrontation and delay. Finally, the numerous findings that the commissioner, the general counsel, and senior staff acted in bad faith demonstrated a leadership which was unwilling to comply with the agreement.

JRC devoted an enormous amount of time, effort, and money to fight off the department's indirect attacks on aversive therapies through needless and excessive regulatory demands. Furthermore, the judiciary spent a considerable amount of its limited resources trying to put an end to the war. Innocent patients, meanwhile, have been caught in the cross fire.[37] The department's intransigent conduct has wasted the resources of JRC, and the courts; it has also hurt the patients.

We recognize that direct judicial intervention into the operation of a State agency is not to be undertaken lightly, but in this case it was necessary because there was no reasonable alternative. See *Perez* v. *Boston Hous. Auth.*, *supra* at 736. See also *Morgan* v. *McDonough*, *supra* at 533. Thus, the judge did not abuse her discretion.

b. *Scope of the receiver's powers.* We consider now whether the judge exceeded her authority in fashioning the receiver's powers. The department contends that the receiver's powers (1) offend the principles of separation of powers expressed in art. 30 of the Declaration of Rights, and (2) are overly broad.

We begin by pointing out that appointing a receiver is not a per se violation of the separation principle. *Perez* v. *Boston Hous. Auth.*, *supra* at 739. When necessary, the role of the judicial branch in civil cases is to provide remedies for violations of the law, including violations committed by the executive branch. *Id.* Therefore, appointing a receiver to restore legality to a State agency which has failed, over a long period of time, to comply with the settlement agreement and abused its regulatory authority by acting in bad faith, does not derogate the separation principle. "To the contrary, when the executive persists in indifference to, or neglect or disobedience of court orders, necessitating a receivership, it is the executive that could more properly be charged with contemning the separation principle." *Id.* at 739-740.

---

[37]JRC staff was forced to take time away from its patients in order to meet department's excessive regulatory demands. As a result, JRC cut back on positive programming, individualized care, and precision teaching programs.

The department correctly points out that the judiciary lacks the authority to order a State agency to do anything that it is not required to do as a matter of law. See *Attorney Gen.* v. *Sheriff of Suffolk County,* 394 Mass. 624, 629-630 (1985). See also *Charrier* v. *Charrier,* 416 Mass. 105, 110 (1993). Along the same lines, we give great deference to a State agency's exercise of its discretionary functions. *Matter of McKnight,* 406 Mass. 787, 792 (1990). This deference, however, does not extend to unreasonable conduct or where an agency is found to be acting contrary to its legal duty. See *Perez* v. *Boston Hous. Auth., supra* at 739-740; *Blaney* v. *Commissioner of Correction, supra* at 342. Thus, to the extent that the receiver's powers are narrowly tailored to remedy the department's violations and restore legality to the situation, they do not violate the separation of powers principle.

Next, we consider the department's argument that the receiver's powers are overly broad. "The law leaves to the sound discretion of the trial judge the issuance and scope of equitable relief." *Commonwealth* v. *Adams,* 416 Mass. 558, 566 (1993). As with all judicial remedies, the receiver's powers should be no more intrusive than reasonably necessary to address the problem. *Lopez* v. *Medford Community Ctr., Inc.,* 384 Mass. 163, 170 (1981). We are particularly careful in applying this standard where public officials are the object of the remedy. *Perez* v. *Boston Hous. Auth., supra* at 729-730.

The receiver was authorized to direct the ordinary affairs of the department with respect to relationships with JRC, its patients, and its families.[38] The judge did not give the receiver plenary powers over the department, rather the receiver's powers were confined to matters related to JRC.[39] The judge deemed these powers necessary to provide relief for JRC and

[38]Contrary to the commissioner's argument, we read nothing in the powers authorized which would enable the receiver to operate outside the law. The receiver is subject to the same statutes and regulations as the department. See *Spence* v. *Reeder,* 382 Mass. 398, 417-418 (1981).

[39]The preamble to the receiver's powers provides: "The [c]ourt, pursuant to its equity jurisdiction shall appoint a [r]eceiver for [the department], who shall have the full authority to administer, manage and operate [the department] *in all of its relationships with JRC, its [patients], and their families,* and who shall control all the funds and revenues of [the department] *as they relate to JRC, its [patients] and their families* and also will assume his authority and take office as soon as possible. Such [r]eceiver shall have

restore legality to this relationship.[40] Once a judge has taken the extraordinary step of appointing a receiver, that judge surely must give the receiver sufficient power to meet the requirements of the situation. *Spence* v. *Reeder*, 382 Mass. 398, 414 (1981). The receiver must have enough power to enforce the judge's decrees, make them completely effective, and thus restore legality. *Id.* See *Perez* v. *Boston Hous. Auth.*, *supra* at 734-735. See also *Commonwealth* v. *Hudson*, 315 Mass. 335, 346 (1943). To the extent that the receiver's powers are tailored to fit this objective, the judge did not exceed her authority.

We agree with the commissioner, however, that not all of the receiver's powers are confined to restoring the department's relationship with JRC. Certain enumerated powers bestowed on the receiver reach beyond the problems between JRC and the department. First, the judge gave the receiver the authority to "approve and execute *all* contracts that [the department] enters into" (emphasis added). Second, the judge gave the receiver the power to exercise considerable authority over the department's staff, including the power to "hire, promote, transfer, discipline, suspend, or discharge all employees of [the department]." These provisions are overly broad because they gave the receiver authority over discretionary functions unrelated to JRC. See *Matter of McKnight*, *supra* at 792. Therefore, these provisions are struck. These considerations, however, do not affect our conclusion that the judge did not otherwise exceed her authority.

4. *Attorney's fees.* The judge ordered the department to pay $1,098,086.59 in attorney's fees. We conclude that the judge erred because she was without statutory authority to order the payment of attorney's fees in these circumstances.[41]

"[C]osts against the Commonwealth, its officers, and agen-

and exercise all *powers presently held by [the department]* as well as any additional powers as may be necessary and appropriate." (Emphasis added.)

[40]The receiver was authorized to conduct a de novo review of any outstanding regulatory decisions, including JRC's certification.

[41]JRC has requested attorney's fees for this appeal. See Mass. R. A. P. 25, as amended, 378 Mass. 925 (1979), and G. L. c. 211, § 10. We do not consider this appeal frivolous as JRC argues, nor does JRC point to any statutory authority permitting the imposition of attorney's fees. See *Commonwealth* v. *One 1987 Ford Econoline Van*, 413 Mass. 407, 415 n.10 (1992); *Yorke Mgt.* v. *Castro*, 406 Mass. 17, 19-20 (1989). Thus, JRC's request for attorney's fees for this appeal is also denied.

cies shall be imposed only to the extent permitted by law."
Mass. R. Civ. P. 54 (d), 365 Mass. 820 (1974). Consequently,
express statutory authority is required to levy costs on the
Commonwealth. See *Ware* v. *Commonwealth*, 409 Mass. 89,
90 (1991); *M.C.* v. *Commissioner of Correction*, 399 Mass.
909, 912 (1987); *Broadhurst* v. *Director of the Div. of Employ-
ment Sec.*, 373 Mass. 720, 722 (1977). This requirement arises
out of the general rule of law that the Commonwealth "can-
not be impleaded in its own courts except with its consent,
and, when that consent is granted, it can be impleaded only
in the manner and to the extent expressed . . . [by] statute."
*Id.*, quoting *General Elec. Co.* v. *Commonwealth*, 329 Mass.
661, 664 (1953).

As a general rule in Massachusetts, a litigant must bear his
own expenses including attorney's fees, except where a statute
permits the award of costs, a valid contract of stipulation
provides for costs, or rules concerning damages permits
recovery. *Waldman* v. *American Honda Motor Co.*, 413 Mass.
320, 322 (1992); *Broadhurst* v. *Director of the Div. of Employ-
ment Sec.*, *supra* at 721-722. Attorney's fees are included in
costs, but successful litigants can recover attorney's fees only
in a very restricted class of cases. *Fuss* v. *Fuss (No.1)*, 372
Mass. 64, 70 (1977).

In civil contempt actions, attorney's fees may be awarded
as an element of the cost of enforcing the order of the court.
*Manchester* v. *Department of Envtl. Quality Eng'g*, 381 Mass.
208, 215-216 (1980). However, this rule does not negate rule
54 (d), that an award of costs against the Commonwealth
requires specific affirmative authority. See *M.C.* v. *Commis-
sioner of Correction*, *supra*; *Broadhurst* v. *Director of Div. of
Employment Sec.*, *supra* at 722, 725 n.8; Mass. R. Civ. P. 54
(d).

Specific authority to impose costs against the Com-
monwealth is found in G. L. c. 261, § 14, which provides:
"In civil actions and in proceedings which are instituted by,
or in the name of, the commonwealth, and not at the rela-
tion, in behalf, or for the use, of a private person, the com-
monwealth shall be liable for costs as is an individual."
However, this statute does not extend liability for costs to ac-

tions naming the Commonwealth as a defendant.[42] *Broadhurst v. Director of the Div. of Employment Sec., supra* at 724.

General Laws c. 12, § 11I, does provide for an award of attorney's fees to the prevailing party in an action brought under G. L. c. 12, § 11H. The 1986 preliminary injunction action raised claims under G. L. c. 12, § 11H.[43] Some courts have held that, in the context of the Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988 (1994), postjudgment monitoring of consent decrees is compensable. See *Brewster* v. *Dukakis*, 786 F.2d 16 (1st Cir. 1986); *Garrity* v. *Sununu*, 752 F.2d 727, 738-739 (1st Cir. 1984). See also *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986). However, we decline to impose postjudgment costs on the Commonwealth without express authority. See *Chapman* v. *University of Mass. Medical Ctr.*, 423 Mass. 584, 586-587 (1996) (no postjudgment interest against Commonwealth without express authority); *Onofrio* v. *Department of Mental Health*, 411 Mass. 657, 659 (1992) (postjudgment interest not recoverable against Commonwealth).

"The rules of construction governing statutory waiver of sovereign immunity are stringent." *Ware* v. *Commonwealth, supra* at 91, quoting *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. 38, 42 (1981). "Consent to a suit must be expressed by the terms of a statute, or appear by necessary implication from them." *Id.* There is no provision for postjudgment costs in G. L. c. 12, § 11I. The fact that the Legislature specifically authorized attorney's fees in cases brought under G. L. c. 12, § 11H, does not lead to the conclusion that attorney's fees may be awarded against the Commonwealth for postjudgment work. See *Ware* v. *Commonwealth, supra* at 91. The

---

[42]In *Commonwealth* v. *One 1987 Ford Econoline Van*, 413 Mass. 407, 414-415 (1992), we upheld an award of attorney's fees against the Commonwealth in a contempt action. The Commonwealth brought the original action, and thus the award of attorney's fees was authorized by G. L. c. 261, § 14. See *Matter of a Grand Jury Subpoena*, 411 Mass. 489, 502 n.14 (1992).

[43]A plaintiff need not litigate the action through final judgment to achieve prevailing party status. Interim success in securing interlocutory relief qualifies the plaintiff as a prevailing party. See *Handy* v. *Penal Insts. Comm'r of Boston*, 412 Mass. 759, 765 (1992) (attorney's fee proper where lawsuit important factor in achieving improvements in prisoners' living conditions); *Draper* v. *Town Clerk of Greenfield*, 384 Mass. 444, 453 (1981), cert. denied sub nom. *Draper* v. *Prescott*, 465 U.S. 947 (1982) (attorney's fee proper where case ends in negotiated settlement).

plaintiffs' counsel have performed in an exemplary manner and deserve to be fully compensated for their efforts. Nevertheless, in the absence of express statutory authority which declares otherwise, we are unable to affirm the award of attorney's fees against the Commonwealth. See *id.* at 92-93.

The case is remanded to the Probate Court for further proceedings consistent with this opinion.

*So ordered.*