van Gestel, J.
This matter is before the Court on a complaint for contempt by the plaintiff, Morgan Stanley DW, Inc. (“MSDW”), against the defendants Robert Clayson (“Clayson”) and Wachovia Securities, LLC (“Wachovia”). The hearings concluded on November 19, 2004. The Court’s findings of fact, rulings of law and an order for judgment follow.
*202 FINDINGS OF FACT
MSDW operates a branch office in Wellesely, Massachusetts, wherein it is engaged in the securities brokerage business. Clayson was employed by MSDW at the Wellesley office from September 1999 until he resigned on June 18, 2004. When hired by MSDW, Clayson executed a Financial Advisor Employment Agreement containing confidentiality and non-competition covenants.
Prior to his employment at MSDW, Clayson was employed from 1976 to 1999 as a Financial Advisor by Bear Stearns. Much of Clayson’s client base serviced at MSDW consisted of his former client base that followed him from Bear Steams.
Instantly upon his resignation from MSDW, on June 21,2004, Clayson became employed as a Financial Advisor at Wachovia in its Waltham office.
MSDW filed suit against Clayson seeking injunctive relief enforcing the confidentiality and non-competition covenants in his employment agreement. The agreement is subject to regulation under the mies of the National Association of Securities Dealers (“NASD”) and contains an arbitration provision before an NASD panel.
On July 12, 2004, this Court issued the following preliminaiy injunction enjoining and restraining Clay-son as follows:
(1) from, directly or indirectly, whether alone or in concert with others, including any officer, agent, representative and/or employee of his new employer, Wachovia Securities, LLC (“Wachovia”), from breaching Clayson’s written agreement of September 8, 1999, with MSDW by:
(a) utilizing or disclosing in any way MSDWs confidential and/or proprietary information and trade secrets, including without limitation, client names other than for those serviced by Clayson previously at Bear Steams, client addresses other than for those serviced by Clayson previously at Bear Steams, and client financial information, and personal information, other than for those serviced by Clayson previously at Bear Steams, for any purpose;
(b) utilizing in any way or furnishing to any third-parly any of the documents and other information, if any, misappropriated by Clayson from MSDW, or extracts or copies thereof;
(c) for aperiod of one year from June 18,2004, and within a radius of one-hundred (100) miles from the MSDW office at 45 William Street, Wellesley, Massachusetts 02481, soliciting, directly or indirectly, any MSDW customers whom Clayson serviced at MSDW other than those serviced by Clayson previously at Bear Stearns, or any MSDW customers he learned of during his employment at MSDW, except for his own family members and relatives, and, further, from servicing or accepting any business or account transfers from MSDW accounts serviced by Clay-son previously at MSDW other than for those serviced by Clayson previously at Bear Steams, acquired hereafter by reason of improper solicitation, such solicitation being any form of communication that requests any MSDW customer to transfer his, her or its business to Clayson at Wachovia; provided that this injunctive relief does not preclude Clayson from servicing any client or account who or which Clayson can prove has followed him to his new employer out of choice and not as a result of solicitation by him (such proof depending in great part upon the nature of the communication between Clayson or Wachovia and the former MSDW customer or account, with a simple announcement that Clay-son has left MSDW to join Wachovia being acceptable, and a communication asking the client or account to follow Clayson to Wachovia, accompanied by a “signature ready” account transfer form and a postage pre-paid return envelope, seen as improper solicitation[1]), nor does it preclude Clayson’s new employer or its agents from servicing said clients, nor still further does it allow MSDW to deny, impede or obstruct the request made by a client for transfer of any account to Clayson’s new employer;
(2) If not already accomplished, Clayson, with his agents, employees and representatives, shall return to counsel for MSDW, on or before 4:00 p.m., July 15, 2004, all documents, computerized materials except for his software called “ACT!,” copies and/or extracts thereof, if any, wrongfully removed by Clayson from MSDW; provided that counsel for him, if he chooses, may prepare and retain a simple list, much like a privilege log, identifying each document by brief descriptive title only — e.g., “customer record for Jane Smith, two pages” — and a copy of such a list, if prepared, must be provided to counsel for MSDW when the documents are returned. MSDW, thereafter, must preserve such documents in an unaltered form pending the conclusion of this litigation and any arbitration that may occur.
Both Clayson and Wachovia were duly served with the foregoing preliminary injunction.
In the period from Clayson’s resignation from MSDW and the Court’s issuance of the preliminaiy injunction a significant number of MSDW accounts followed Clayson and were transferred to Wachovia.
On July 15, 2004, counsel for Clayson delivered to MSDW 14 pages of client account statements representing clients that Clayson serviced while employed by MSDW, excluding documents relating to clients of MSDW who had transferred their accounts and Clayson’s preexisting Bear Steams clients. Clayson also informed MSDW that electronic data relating to clients, including contact information, notes, meet *203 ings, etc., were stored in the ACT! Program database on Clayson’s former computer at MSDW. He informed MSDW that the password to the ACT! Program was “dietcoke.”
On August 10, 2004, this Court issued the following memorandum and order:
This matter came before the Court on a request by the plaintiff, Morgan Stanley DW, Inc. (“MSDW’), seeking enforcement of a preliminary injunction issued on July 12, 2004. Among other things, the preliminary injunction included the following:
If not already accomplished, Clayson, with his agents, employees and representatives, shall return to counsel for MSDW, on or before 4:00 p.m., July 15, 2004, all documents, computerized materials except for his software called “ACT!,” copies and/or extracts thereof, if any, wrongfully removed by Clayson from MSDW; provided that counsel for him, if he chooses, may prepare and retain a simple list, much like a privilege log, identifying each document by brief descriptive title only — e.g., “customer record for Jane Smith, two pages” — -and a copy of such a list, if prepared, must be provided to counsel for MSDW when the documents are returned. MSDW, thereafter, must preserve such documents in an unaltered form pending the conclusion of this litigation and any arbitration that may occur.
The Court expects that this Order will be fully complied with. It includes: aU. documents, computerized materials except for his software called “ACT!,” copies and/or extracts thereof, if any, wrongfully removed by Clayson from MSDW.
The Court is told in the motion papers that Clayson only returned 14 pages of materials and did not include any computerized materials. All documents must be returned. There is no exclusion for prior Bear Stearns customers here. However, the Court will permit Clayson to make and retain copies of those documents relating to his prior Bear Stearns customers.
Also, the computerized materials include customer data contained in the ACT! database, although not the ACT! software itself. A mere fourteen pages does not sound like anything close to compliance with the Order. Now that the Court’s intent is — as it seems that it always was — clear, it expects essentially instant compliance. Any failure will be treated as an act of contempt.
After the issuance of the August 12, 2004, order, Clayson, on August 15, 2004, produced the following additional documents to MSDW:
(1)331 contact records from Clayson’s ACT! database relating to clients he serviced while at MSDW;
(2) 409 pages from Clayson’s personal correspondence file and his personal accounts;
(3) 1140 pages which relate to former Bear Stearns clients whom Clayson serviced while at MSDW and who now are being serviced at Wachovia;
(4) 309 pages which relate to clients whom Clayson serviced while at MSDW and whom he now services at Wachovia; and
(5) three MSDW client files.
Clayson learned that MSDW was having trouble accessing his ACT! database, despite being given the “dietcoke” password. He offered to go to the Wellesley office and assist, but his offers were, initially at least, turned down.
On October 8, 2004, in order to break the impasse over access to Clayson’s ACT! database, this Court entered the following order:
(1) The plaintiff, MSDW, shall have the option, to be exercised in a writing filed with the Court and simultaneously served on counsel for Clayson on or before 4:00 p.m. on October 15, 2004, of either (a) permitting an examination of the computer by Clay-son, at the MSDW place of business, under the conditions set forth below or (b) accepting the Court’s ruling that the information that Clayson has asserted is on the computer that he used while in the employ of MSDW is in fact still thereon and accessible through the instructions heretofore provided.
(2) Should MSDW opt to permit an examination by Clayson, the rules of engagement for such examination are as follows:
(a) Any examination shall take place outside of regular business hours, starting at either 7:30 a.m. or 5:00 p.m. and taking no longer than 45 minutes, on any business day or between 9:00 a.m. and 11:00 a.m. on a Saturday morning agreed to by the parties.
(b) Clayson may be accompanied by his counsel. MSDW may also have its counsel present, as well as a computer technician selected by it.
(c) The examination shall take place at MSDWs Wellesley Branch office.
(d) Clayson may instruct the computer technician as to how to gain access to the materials he claims are there, including providing any necessary password(s) and such other steps required therefor. The computer technician, not Clayson, shall be the person who manipulates and facilitates the computer keyboard, with guidance from Clayson, to gain the necessary access. In the process, Clayson may suggest to the technician any additional instructions that may be necessary in the process, provided, however, that this is not to be an experiment or an endless chase, but rather the following of the usual kinds of steps in a process of this nature.
*204 (e) If the information sought is accessed, then print-outs shall be made of the particular screens, with copies provided to counsel for MSDW and Clayson.
(f) The examination shall be completed no later than October 23, 2004. Each side shall submit to the Court by October 26, 2004, in affidavit form, a report of what occurs.
An inspection of Clayson’s computer at MSDW occurred on October 25, 2004. Clayson’s entire ACT! database was located on his former MSDW computer. In addition, a backup to Clayson’s ACT! database was also located on the MSDW computer.
As of the date of the contempt hearing, Clayson and Wachovia still had not turned over to MSDW his ACT! database computerized materials.
RULINGS OF LAW
In order to hold a party in contempt, the Court must find a clear and undoubted disobedience of a clear and unequivocal command. Judge Rotenberg Educational Center, Inc. v. Commissioner of the Dept. of Mental Retardation, 424 Mass. 430, 442-43 (1997); United Factory Outlet, Inc. v. Jay’s Stores, Inc., 361 Mass. 35, 36 (1972).
Good faith, absence of wilful disobedience, and lack of intent to violate an injunction are not valid defenses. United Factory Outlet, Inc., supra, 361 Mass. at 37. Acting on advice of counsel is no excuse either. Alves v. Town of Braintree, 341 Mass. 6, 12 (1960).
Civil contempt has as its purpose not punishment but rather achieving compliance with the Court’s orders for the benefit of the complainant. Commonwealth v. Rape Crisis Services of Greater Lowell, Inc., 416 Mass. 190, 193 (1993). The purpose being remedial, the formation of a remedy is within the discretion of the Court. Eldim, Inc. v. Mullen, 47 Mass.App.Ct. 125, 129 (1999). Such remedy may also include an amount reflecting fees and costs of bringing suit. See, e.g., Police Commissioner of Boston v. Gows, 429 Mass. 14, 18-19 (1999); Allen v. School Committee of Boston, 400 Mass. 193, 194 (1987); Eldim, Inc., supra, 47 Mass.App.Ct. at 130-31.
It is a close question whether this Court’s preliminary injunction is a clear and unequivocal command. It certainly seems so to this Court. In any event, there was nothing left to doubt after the August 10, 2004, order.
Further, it does not go unnoticed that the parties here are not innocents in the business of running securities brokers’ offices and, particularly, in the all too frequent process by which a broker leaves one office to join another and bring as many clients as he can from the abandoned office with him to his new business home. This Court has heard many of these kinds of cases. In exercising its general equity powers when applying Mass.R.Civ.P. Rule 65, the Court has, as it must, applied the teachings in Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980), particularly as they relate to likelihood of success on the merits, irreparable harm and balance of equities. In so doing, the Court has felt uncomfortably constrained by the Decisions and Orders in Salomon Smith Barney, Inc. v. Wetzel, Mass.App.Ct. No. Ol-J-44 (January 29, 2001 and February 2, 2001), and Salomon Smith Barney, Inc. v. Barcomb, Mass.App.Ct. No. 02-J-692 (January 3, 2000). See, e.g., this Court’s decision in UBS PaineWebber, Incorporated v. Dowd, Suffolk Superior Court Civil Action No. 01-5402 BLS, 2001 WL 1772856 (Nov. 29, 2001) (14 Mass. L. Rptr. 212).
The litigational relationships among members of the NASD is regulated by industry-compelled arbitration. Parties to such arbitration, like MSDW and Clay-son here, may, nevertheless, seek preliminary injunctive relief from a court of competent jurisdiction in support of that arbitration. That is what occurred here.
Clayson had a non-solicitation and confidential information protection agreement with MSDW. It is the customers of MSDW, served by Clayson, and those customers’ records, that are the targets of the injunc-tive relief originally sought. The all too familiar minuet was danced here. Late on a Friday afternoon Clayson quit his job at MSDWs Wellesley office and first thing on the next Monday morning started his employment with the Wachovia office in Waltham. This was not a freak accident of good fortune for Clayson; it was planned in advance. Clayson’s change in employment was, in part at least, made known by him to some of his former MSDW customers, and before Clayson started work at Wachovia some of those customers already were provided with the necessary ACAT forms to instantly change their accounts to follow Clayson to Wachovia.
Effective on December 21, 2001, the NASD announced Rule 2110-7. That Rule reads in its entirety as follows:
It shall be inconsistent with just and equitable principles of trade for a member or person associated with a member to interfere with a customer’s request to transfer his or her account in connection with the change in employment of the customer’s registered representative, provided that the account is not subject to any lien for monies owed by the customer or other bona fide claim. Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written •request from a customer to transfer his or her account. Nothing in this interpretation shall affect the operation of Rule 11870.
In February 2002 the NASD issued Notice to Members 02-13. In so doing, the NASD explained that it had approved amendments to Rule 10335 of the NASD Code of Arbitration Procedure (“Code”). This is the *205 Rule that governs intra-industry disputes like that in the underlying case before this Court. The effective date of these amendments was March 25,2002. Under these amendments, temporary injunctive relief by the NASD became no longer available. The right of parties to seek such relief in a court of competent jurisdiction, however, remained as an option. If a court issues temporary injunctive relief the NASD then will conduct an expedited hearing.
Still further, this Court is aware of two decisions on hearings under the amended Rule 10335: Merrill Lynch Pierce Fenner & Smith, Incorporated v. Stark et al., Case #02-05187, heard on September 19, 2002, and Merrill Lynch Pierce Fenner & Smith, Incorporated v. Sherman et at, Case #02-05989, heard on October 23, 2002.
In the Stark case, the arbitration panel denied the claimant’s request for injunctive relief. The basis for the denial was the rights of customers. The panel said,
Customer rights are of primary importance and [the panel] is concerned customers are, or may be, subject to harm due to this dispute. The fiduciary duties owed by the parties to the customers are superior to any duties owed by employees to the former employer. The customers have a paramount right to be advised of the move by their broker and, that this right includes receiving personal contact from their broker. The customers have the right to be informed that they decide whether to remain with Merrill Lynch or to transfer their account. Customer names and addresses and telephone numbers are not confidential.
In the Sherman case, the arbitration panel again denied the claimant’s request for an injunction and noted, “The TRO is hereby dissolved effective November 5, 2002.”
This Court, like the NASD, is concerned that the clients — who are wholly innocent in this shuffle of their financial advisor from one brokerage house to another — may well be subjected to harm from any restraints issued. It is precisely for that reason that the July 12, 2004, preliminary injunction was carefully crafted to do the least amount of harm to the clients.
As this Court observed in its July 12, 2004, order, since the establishment on October 2, 2000, of the Business Litigation Session of the Superior Court, previously to this case, this Court had addressed 29 cases by brokerage firms against individual brokers leaving, abruptly, to join another brokerage firm. In each instance the plaintiff firm sought injunctive relief. In those 29 cases, 21 have been brought by three major brokerage firms: Morgan Stanley DW, Inc., the plaintiff here; UBS PaineWebber (“UBS PW”); and Salomon, Smith Barney (“SSB”). These three major brokerage firms have been the plaintiffs in seven cases each. In that same aggregation of 29 cases, MSDW and UBS PW have been the brokerage firm to which the defendant broker has defected in six cases each, and SSB has been that firm in five cases. Whatever happened to the “maxim of equity with the dignity of antiquity . . . that one who seeks equity must do equity?” Nolan and Sartorio, Equitable Remedies, 31 M.P.S. Sec. 168.
It is in this hodgepoge of peripheral litigation that this outrage of contempt is screamed by MSDW. All involved in this case know well how the game is played; and all play the game to the hilt. The brokerage houses are the injured innocents when a broker leaves them for a competitor one week and the conspiring raider the next. And it is all accomplished in the hunt for “OPM” — other peoples’ money. In assessing the claim here, this Court has in mind the real world of broker employment and movement in the face of non-competition and non-solicitation covenants.
There was a failure by Clayson and Wachovia to comply with this Court’s orders. But what was the harm? Certainly Clayson, with the conscious complicity of Wachovia, was knowingly slow in returning information to MSDW. But this Court cannot comfortably say that the knowing failures were in clear violation of its order until after August 10,2004. There was, perhaps, a bit of a lack of clarity in the July 12, 2004, order as it related to Clayson’s former clients at Bear Stearns.
By August 10, 2004, however, most of the damage was done — and that damage, presumably, will be sorted out by the NASD arbitrators. Thereafter, the only serious violation was the continued failure of Clayson, and probably Wachovia, to turn over to MSDW the entire ACT! database. It was no excuse that the database was also located on Clayson’s former MSDW computer. It was not just that MSDW had that information — or could have had it if it could access Clayson’s computer — it was the fact that Clayson, and his new employer Wachovia, also had that information to be used for their advantage.
To this extent there was contempt. What then, is the appropriate relief? The NASD arbitration panel will sort out and award appropriate damages. So what is the necessaiy remedy here?
Since the purpose of a civil contempt proceeding is remedial, as a matter of law, the awarding of attorneys fees is an appropriate element of a successful contempt proceeding. Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501, 571 (1997); Arch Medical Associates, Inc. v. Bartlett Health Enterprises, Inc., 32 Mass.App.Ct. 404, 409 (1992).
ORDER FOR JUDGMENT
On the foregoing findings and rulings, judgment shall enter in favor of MSDW on its complaint for contempt in the following manner:
Within 14 days of this Order, the defendants are to return to MSDW any and all documents and com *206 puterized materials (including Clayson’s ACT! database), copies or extracts thereof removed by Clayson from MSDW. In this regard, Clayson may make and retain copies of documents relating to clients he previously serviced at Bear Stearns, and the defendants may retain the software of the ACT! program. Specifically, the defendants must produce to MSDW, in computerized form, the database and all of the Statement Pages, including the Statement Pages maintained in the Paglierini correspondence file, and all copies and excerpts from these documents.
Further, to the extent that the defendants must retain copies of any of the foregoing documents and materials to comply with any securities industry statute, regulation or self-regulatory organization rule or standard, they must produce to MSDW a complete copy of any document or computerized data file that they claim they must retain, and the defendants must produce to MSDW a detailed log specifying each document and each computerized data file and specifying, for each document or computerized file, the specific statute, regulation, rule or standard which they contend requires them to retain a copy of such document or data file.
Still further, the defendants shall pay to the plaintiff the reasonable attorneys fees and costs incurred in prosecuting this contempt proceeding. If the parties are unable to agree on such fees and costs, MSDW shall submit affidavit evidence thereof, which the defendants shall have five business days to respond to. Thereafter, the Court, either on the papers or after a hearing, will determine the fees and costs.

See, e.g., this Court’s Memorandum and Order in UBS PaineWebber, Incorporated v. Dowd, Suffolk Civil Action No. 01-5402 BLS (November 29, 2001) (14 Mass. L. Rptr. 212).