Gants, Ralph D., J.
The defendant Michelle Griffin (“Griffin”) was a financial advisor in the Boston branch of the plaintiff, The Smith Barney Division of Citigroup Global Markets, Inc. (“Smith Barney”), until December 28, 2007, when she resigned to accept a financial advisor position with NY Life. Griffin began her employment with Smith Barney (when it was known as Shearson Lehman Brothers, Inc.) as a sales assistant. After receiving her Series 7 license, she entered a training program with Shearson to become a financial consultant associate and executed on January 24, 1994 a Financial Consultant Training Contract (“the Contract”). Among the terms in this Contract were the following:
I understand that any client records and information including names and addresses and account information, whether generated by Shearson Lehman Brothers or me, are confidential and proprietary information as well as an important business asset of Shearson Lehman Brothers. I will use such originals or copies of information only in the normal course of Shearson Lehman Brothers’ business and will not remove any client-related records from Shearson Lehman Brothers’ premises during or after my employment, nor will ever transfer such information to any third party either orally or in writing.
If I leave Shearson Lehman Brothers for any reason I will not, within six (6) months of my leaving solicit any of the clients I serviced at Shearson Lehman Brothers or any clients I learned of during my employment at Shearson Lehman Brothers.
*458 I understand that Shearson Lehman Brothers may at various times decide not to enforce all or part of this contract or similar contracts with other Shear-son Lehman Brothers Financial Consultant Associates. I agree that such instances of non-enforcement shall not constitute a waiver, and will not prevent Shearson Lehman Brothers from enforcing any or all of the remaining portions of this contract against me.
Smith Barney has filed this action to seek a prelimi-naiy injunction against her enforcing the non-solicitation and confidential information provisions in this 1994 Contract reprinted above. After hearing, Smith Barney’s motion for preliminaiy injunction is DENIED.
BACKGROUND
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). The preliminary findings of fact below are based on the affidavits and attached exhibits furnished by the parties.
After successfully completing the training program, Griffin became a financial consultant, paid only by commissions. She remained a financial consultant until roughly two years ago when Smith Barney decided to refer to financial consultants as financial advisors. Griffin developed the majority of her client accounts from “cold-calling” individuals from a list that she personally bought. A minority of clients were referred to her by other Smith Barney financial advi-sors or were taken over by her when another financial advisor left Smith Barney. Her decision to leave Smith Barney was triggered by a change in Smith Barney’s compensation plan, which beginning in 2008 would reduce the “payout” to financial advisors for gross production just under $300,000 from 33 percent to 27 percent. Since her production was at or around $300,000, Griffin did not want to suffer the risk that her compensation would be considerably reduced if her production in 2008 fell below $300,000. In mid-November 2007, she mentioned the possibility of her leaving Smith Barney to three to five of her clients to determine if they would have a problem -with her leaving. Apparently heartened by their response, she decided to leave Smith Barney and accept a similar position as a financial advisor with NY Life.
On the day she resigned, December 28, 2007, she gathered the account statements of her clients and telephoned between 30 to 40 of her clients to inform them that she was resigning from Smith Barney, was joining NY Life, and would love for them to come with her to NY Life. She promised to telephone them when her financial advisor’s license had been transferred to her new firm. At 4 p.m. that day, she informed Mark Boersma, a Vice-President of Smith Barney and the Assistant Branch Manager of the Boston branch, that she was resigning from Smith Barney to join another financial services firm.[1] Boersma told her that she could not take any client documents with her but could take client names and telephone numbers. She told him she would take the customer list, but cut the account numbers off the list and gave the account numbers to him. She did not tell him that she had made copies of and was taking her clients’ account statements.[2]
On Saturday, December 29, 2007, she went to her new office at NY Life and began calling her clients to inform them of her change in employment and to urge them to transfer their accounts to join her at NY Life. When she returned to her house that afternoon, she found a letter from Smith Barney’s counsel informing her that she was bound by the 1994 Contract not to solicit any of her Smith Barney clients for six months. After receiving this letter, she stopped making any further solicitation calls and retained her own attorney.
On January 7, 2008, she entered into a Stipulation for the Entry of a Temporary Restraining Order with Smith Barney, making clear in the stipulation that, by entering into it, she was neither conceding any allegations made by Smith Barney nor conceding that a Temporary Restraining Order would be an appropriate remedy in the absence of a stipulation. As part of the stipulated Temporary Restraining Order, Griffin agreed to return to Smith Barney the clients’ account statements she had taken with her (retaining no copies), and to deliver the list of clients to her attorney pending resolution of the motion for preliminary injunction. She also agreed not to solicit any of her Smith Barney clients until the motion for preliminary injunction was resolved. There is no dispute that she has done what she promised.
Prior to the preliminary injunction hearing, Griffin learned from various clients that Smith Barney had told them that NY Life, as an insurance company, does not offer the brokerage services offered by Smith Barney (which she contends is not true), and one client told Griffin that Smith Barney had said that Griffin left because of “personal issues” (which she also contends is not true).
DISCUSSION
The undersigned judge and Judge Allan van Gestel in the Business Litigation Session have struggled for many years with various motions, such as this, brought by financial service companies seeking preliminary injunctions that would prohibit their departing financial advisors from taking any client information with them and from soliciting their former clients to transfer their accounts to the new firm. As Judge van Gestel has described it:
This Court has heard many of these kinds of cases. The pattern is similar in all cases. A stock broker, or person seeking to become a stock broker, joins a brokerage house, signs a non-solicitation agreement and also agrees to keep certain information confidential. After a period of time, the broker, often *459 solicited by a competing brokerage, decides to leave his employing-brokerage for the competition down the street. Without prior warning, the broker resigns at the end of the day on Friday and is up and running at his new employer by Monday morning. These brokers move around with astounding frequency, and the whole industry knows it. . .
What follows is a race to the Court by the jilted brokerage seeking injunctive relief, all in anticipation of industry-mandated arbitration before the NASD.
UBS Paine Webber Inc. v. Dowd, 14 Mass. L. Rptr. 212, 2001 WL 1772856 (Mass.Super. 2001).
The reasons these cases have posed such difficulty for this Court are five-fold. First, the enforcement of the confidentiality and non-solicitation provisions punishes the clients of the departing financial advi-sors, many of whom have relied upon the advice of their financial advisor for many years in deciding how to invest their life savings. If these provisions are enforced to the letter, as is generally sought by the jilted financial services company, the clients’ financial advisor one day simply disappears without warning. The financial advisor cannot inform her clients by telephone, letter, or email of her impending departure before she resigns because the financial services company deems this a misuse of confidential customer information. The financial advisor cannot inform them by telephone, letter, or email of her departure after she has resigned because she is not allowed to take with her the client information that would allow her to know each former client’s telephone number, home address, or email address. If a client were to call the financial advisor’s former telephone number at the company looking for her, the client generally is simply told that she has left the company, without explaining why she left or where she has gone. A more sinister firm might imply that the financial advisor had been fired or forced to resign or otherwise left under a cloud. If the client succeeds in tracking down where his former financial advisor has gone and reaches her at her new firm, the financial advisor must be extremely cautious in what she says, lest she be found to have solicited the client’s business in violation of her non-solicitation agreement. This is hardly the way any client would wish to be treated, especially by a trusted financial advisor, yet it is precisely how these clients would be treated by financial services companies if their motions for preliminary injunctions were granted.
Second, while many financial services companies claim that they are (in the words of Police Captain Louis Renault in the movie Casablanca) “shocked, shocked” that another financial service company would show so little respect for the sanctity of a contract preserving confidential client information and prohibiting client solicitation as to induce their financial advisor to breach such a contract, they are themselves engaged in precisely the same “shocking” conduct.[3] Judge van Gestel, who no doubt has adjudicated more of these cases than anyone in the history of the Massachusetts Superior Court, spoke passionately and eloquently about such apparent hypocrisy:
As this Court observed in its July 12, 2004, order, since the establishment on October 2, 2000, of the Business Litigation Session of the Superior Court, previously to this case, this Court had addressed 29 cases by brokerage firms against individual brokers leaving, abruptly, to join another brokerage firm. In each instance the plaintiff firm sought injunctive relief. In those 29 cases, 21 have been brought by three major brokerage firms: Morgan Stanley DW, Inc., the plaintiff here; UBS PaineWebber (“UBS PW”); and Salomon, Smith Barney (“SSB”). These three major brokerage firms have been the plaintiffs in seven cases each. In that same aggregation of 29 cases, MSDW and UBS PW have been the brokerage firm to which the defendant broker has defected in six cases each, and SSB has been that firm in five cases. Whatever happened to the “maxim of equity with the dignity of antiquity . . . that one who seeks equity must do equity?” Nolan and Sartorio, Equitable Remedies, 31 M.P.S. Sec. 168.
Morgan Stanley DW, Inc. v. Clayson, 19 Mass. L. Rptr. 201, 2005 WL1009651 (Mass.Super. 2005).
Third, the non-solicitation agreements enforced in most of these financial services preliminary injunctions were presented, as here, to the financial advisor when she first commenced employment with the company, without separate consideration beyond continued employment (or perhaps training), and without any choice apart from termination. Consequently, they are routinely signed without significant thought, in large part because the employee has no meaningful alternative. Since all (or virtually all) financial services companies require similar agreements, a refusal to sign such an agreement would effectively bar the employee from employment in the financial services industry. As such, these agreements stand in sharp contrast to comparable agreements involving the sale of a business, where the seller is receiving significant additional consideration for the agreement not to compete or to solicit, and has a meaningful alternative of rejecting such a restrictive covenant (albeit in return for a lower sales price).
Fourth, the legal justification for restricting the ability of the departing financial advisor to solicit her former clients is largely the protection of the financial services company’s goodwill.[4] The goodwill, however, that a financial services company legitimately may preserve is its own goodwill, not the goodwill earned by the employee that fairly belongs to the employee. See Sentry Insurance v. Firnstein, 14 Mass.App.Ct. 706, 708 (1982) (“The objective of a reasonable non-competition clause is to protect the employer’s good will, not to appropriate the good will of the employee”). *460 The dilemma is that, to some degree, the company’s goodwill and the employee’s goodwill are inevitably intertwined. The financial advisor may have obtained most of her clients on her own (as Griffin did), without the help of the financial services company, and the quality of the service and investment advice she provides may be what has preserved the loyalty of her clients. Alternatively, the financial advisor may have obtained many of her clients from loyal clients of the company who stayed with the company after their financial advisor left the company, and the financial advisor’s investment advice may have benefitted from the financial research and advice provided by company employees the client never meets or speaks to. Consequently, a non-solicitation provision may protect the goodwill earned by the company at the expense of the goodwill earned by the financial advisor on her own.
Fifth, the confidentiality provisions of these agreements, as here, protect all client records and information, including the names, addresses, and telephone numbers of all clients. From the point of view of the client, the clients’ account statements are plainly confidential, since they reveal the amount and nature of the clients’ investments, information that the client necessarily entrusts to the financial services company and would certainly not wish to share with others. The client reasonably expects such sensitive financial information to be held in confidence by the financial services company and would reasonably expect that such information would not travel with the departing financial advisor unless and until the client submits the documents needed to transfer the account to the financial advisor’s new company. It is a more complex question as to whether the clients’ names, addresses, and telephone numbers are confidential. The client routinely shares that type of information with others and would reasonably expect that the departing financial advisor would know this information and may not forget it when she changes jobs. Moreover, if a court were to treat this information as confidential and bar the departing financial advisor from using it in any way, the court would also be effectively barring the financial advisor from even notifying her prior clients of her change in employment and present whereabouts by letter, telephone, or email, because such notification would require the now-departed financial advisor to make use of her former clients’ names, addresses, or telephone numbers.
This case poses each of these five issues, but it adds a sixth — Smith Barney is a signatory to the Protocol for Broker Recruiting (“the Protocol”), an agreement that, according to Smith Barney’s counsel, has now been entered into by 39 financial institutions (but not by NY Life). Under the Protocol (a copy of which is attached to this decision as Appendix A), these financial institutions agreed that, if a financial advisor[5] leaves one signatory financial institution to join another signatory institution, the latter will have no monetary or other liability to the former if the departing financial advisor follows the terms of the Protocol and the new firm does not engage in “raiding.”[6] According to the Protocol, when a financial advisor leaves one firm to join another, she may take with her the following account information of the clients she had serviced: name, address, telephone number, email address and account title (“Client Information”). She may not take any account numbers or other account information. Her resignation should include a copy of the Client Information she is taking with her. She may not solicit her clients to join her at her new firm until she leaves her old firm but, once she joins her new firm, she is free to solicit her former clients and to use the Client Information to do so.
Smith Barney contends that the Protocol is irrelevant to this motion for preliminary injunction because it is simply a forbearance agreement that does not apply here, since NY Life is not a signatory. This Court agrees that the Protocol, as a contractual matter, does not bar Smith Barney from bringing this action to seek preliminary injunctive relief (since NY Life is not a signatory), but it does not agree that the Protocol is inconsequential to the decision of whether preliminary injunctive relief equitably is warranted.
The Contract here provides that it is to be governed in all respects by New York law. New York law, like Massachusetts law, recognizes that a non-solicitation agreement is “a form of ancillary employee anti-competitive agreement that will be carefully scrutinized by the courts.” BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388 (1999). Similarly, like Massachusetts law, New York law provides that “[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.” Id. at 388-89 (emphasis in original).[7] In determining whether to issue a preliminary injunction, this Court considers not only whether the Contract’s restraint on Griffin’s ability to compete with Smith Barney is reasonable under New York law, but also whether this Court’s equitable power should be used to preliminarily enjoin violation of the Contract. As to the latter, this Court is governed by the three-part balancing test articulated in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). First, this Court must evaluate the moving party’s claim of injuiy and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 & n.ll. Third, “[i]f the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing *461 these factors, “[w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id.
The Protocol sheds light on three questions that are critically important in determining whether this Court should issue a preliminary injunction:
1. Does Smith Barney regard Client Information, as defined in the Protocol, truly to be confidential?
2. Is the non-solicitation agreement in the Contract truly necessary to protect the goodwill of Smith Barney?
3. Is a preliminary injunction truly necessary to prevent a substantial risk of irreparable harm?
This Court finds that, when one considers the Protocol, the answer to each question is “no.”
As to the first question, both New York and Massachusetts law consider the six factors set forth in the Restatement of Torts, §757, comment b in determining whether information is truly confidential: “(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.” Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972), citing Restatement of Torts, §757, comment b; Ashland Mgt. v. Janien, 82 N.Y.2d 395, 407 (1993), quoting Restatement of Torts, §757, comment b. Under the Protocol, Smith Barney permits Client Information to be freely taken by departing financial advisors who leave for another signatory financial institution, even though this information is characterized as confidential information in its Contract with Griffin. Applying the six factors, Smith Barney cannot have it both ways — it cannot declare this information to be confidential and, at the same time, permit this information freely to be taken to 38 other financial institutions by departing financial advisors.
Moreover, by allowing its departing financial advi-sors to leave with this Client Information, Smith Barney is effectively declaring that it does not consider this Client Information to be “nonpublic personal information” under the federal Gramm-Leach-Bliley Act, Pub. L. No. 106-02, 113 Stat. 1338 (1999) (codified at 15 U.S.C. §6801 et seq.) (“the Act”). If it were, the disclosure permitted under the Protocol would be barred by the Act, because a financial institution may not disclose “nonpublic personal information” to a nonaffiliated third party (such as a competing financial institution) without providing the consumer with notice of its disclosure (which the Protocol does not provide). 15 U.S.C. §6802(a). Since one can infer that Smith Barney (and the other 38 signatories) did not intend to violate the Act by signing the Protocol, one can infer that Smith Barney determined that Client Information falls outside the rubric of “nonpublic personal information.”[8] If Client Information is not fairly characterized as “nonpublic personal information,” then presumably it can be fairly characterized as public personal information, and, if so characterized, it can hardly be viewed as confidential.
As to the second question, through the Protocol, Smith Barney has implicitly recognized that there is an alternative way to protect its goodwill when a financial advisor leaves for another firm — promptly identify the clients of the departed financial advisor and seek to persuade them to stay. The Protocol requires the departing financial advisor to identify the Client Information she is taking, the same information that Griffin provided to Boersma without even knowing about the Protocol.[9] Presumably, the reason for this disclosure is to permit the financial institution to act quickly to contact those clients itself.
As to the third question, if there truly was a significant risk of substantial irreparable harm from departed financial advisors soliciting their former clients, one would not expect Smith Barney to have entered into a Protocol permitting precisely that. While the Protocol still preserves a financial institution’s ability to sue another for “raiding,” it does not provide any mechanism to compensate a firm that loses a disproportionate number of financial advisors to other firms. If their solicitation of former clients truly posed a risk of substantial irreparable harm, one would not expect the Protocol to read, “[Financial advisors] that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms." Protocol at 2. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brennan, 2007 WL 632904 (N.D. Ohio 2007) (“By setting up such a procedure for departing brokers to take client lists, Merrill tacitly accepts that such an occurrence does not cause irreparable harm”).
In short, even before this Court knew of the Protocol, this Court, in comparable circumstances, applying the three-part balancing test required by Packaging Industries Group, Inc., found it to be a close question whether financial institutions should be entitled to preliminary injunctive relief to enforce non-solicitation agreements of the type found here. When this Court adds the Protocol to the balance, the equities shift in favor of the departing financial advisor. When Smith Barney permits its financial advisors to leave for 38 other financial institutions and solicit their former clients with Client Information they took from Smith Barney, it cannot credibly contend that *462 the harm that will result if Griffin is allowed to do the same at a 39th firm is so substantial and so irreparable that this Court should exercise its equitable authority to prevent it and thereby limit Griffin’s ability to compete for these clients in her new job. Since NY Life did not sign the Protocol, Smith Barney is certainly free in NASD arbitration to seek compensation for any economic harm it can prove was caused by Griffin’s solicitation of her former clients. But in deciding whether Smith Barney is entitled to preliminary in-junctive relief while it awaits any arbitral award, the balance of the equities now favors Griffin.[10]
ORDER
For the reasons stated above, the defendant’s motion for preliminary injunction is DENIED.

The record is unclear whether she specifically told him she was joining NY Life.

Griffln had been told by other financial advisors that departing financial advisors customarily take with them their clients’ account statements.

For anyone not familiar with this film, Captain Renault, after ordering Rick’s Cafe closed for operating a gambling establishment, was paid his gambling winnings by Rick’s employee before he left the Cafe.

A non-solicitation provision, like an employee covenant not to compete, generally is enforceable only to the extent that it is “necessary to protect the legitimate business interests of the employer.” Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287 (1974). “Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with his customers.” Id.

The Protocol refers to them as “Registered Representatives.” For simplicity, this Court will continue to refer to them as financial advisors.

The term, “raiding,” is not defined in the Protocol.

Under Massachusetts law, a non-solicitation agreement, like an employee covenant not to compete, generally is enforceable only to the extent that it is “necessaiy to protect the legitimate business interests of the employer.” Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287 (1974). “Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with his customers.” Id.

This Court does not here determine whether Smith Barney is correct in determining that this Client Information is not “nonpublic personal information” under the Gramm-Leach-Bliley Act. See Trans Union LLC v. Federal Trade Commission, 295 F.3d 42 (D.C. Cir. 2002) (considering the Federal Trade Commission’s regulatory definition of “nonpublic personal information”). It is sufficient here that Smith Barney has effectively made this determination.

Griffin was not told of the Protocol and did not know of its existence prior to her departure. As a result, she did not consider whether she should join a financial institution that was a signatory to the Protocol.

In closing, this Court will address two of Smith Barney’s less persuasive arguments in footnote. First, Smith Barney contends that, even if the Protocol had been signed by NY Life, it would not apply because Griffin violated its terms when she began soliciting her clients to come with her on her last day at Smith Barney and brought her clients’ account statements with her. Smith Barney, of course, did not tell Griffin about the Protocol, so she could hardly be expected to know its terms. To be sure, Griffin did err in “jumping the gun” by a day in telephoning her clients about her move and in taking the account statements with her, but this Court does not find these errors to be so consequential as to justify preliminary injunctive relief, especially since she promptly stopped soliciting her former clients and returned the account statements after Smith Barney claimed she was in breach of the Contract.
Second, Smith Barney correctly notes that the Contract provides that, if Shearson decides not to enforce similar contracts with others, it does not constitute a waiver of its right to enforce this Contract against Griffin. This Court, however, does not find that Smith Barney, by signing the Protocol, waived its right to enforce the Contract against Griffin. The Protocol is significant in this Court’s balancing test, not because the Court sees it as a waiver of rights, but because of what the Protocol implicitly says regarding Smith Barney’s failure to protect the confidentiality of Client Information, its estimation of the danger of loss of goodwill, and the magnitude of the risk of irreparable injury.